STATE of West Virginia, Plaintiff,

v.

Arch A. MOORE, Jr., et al., Defendants.

C.A. No. 2:90–0747.

United States District Court,
S.D. West Virginia,
Charleston Division.

July 27, 1995.

worker must prove some act of negligence on the part of the employer.").

Rebecca A. Baitty, Sarasota, FL, Darrell V. McGraw, Jr., Katherine A. Schultz, Office of Attorney General, Charleston, WV, and Michael Goldsmith, Professor, Brigham Young University, Provo, UT, for plaintiff.

James A. Varner, Catherine D. Munster, McNeer, Highland & McMunn, Clarksburg, WV, James B. Lees, Jr., and Sharon M. Fedorochko, Hunt, Lees, Farrell & Kessler, Charleston, WV, for defendants.

### *MEMORANDUM OPINION*

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on defendant Arch A. Moore's Motion for Partial Summary Judgment. For the reasons stated below, the motion is granted in part and denied in part.

### BACKGROUND

On June 12, 1992, the State of West Virginia ("the State") filed a 13–count Amended Complaint against former West Virginia Governor Arch A. Moore ("Moore"). The complaint includes five claims pursuant to 18 U.S.C. § 1962, the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Additionally, the State has brought claims for breach of contract, breach of fiduciary duty, actual fraud, constructive fraud, civil conspiracy, malfeasance, and unjust enrichment, in addition to a punitive damages claim.

Moore has moved for partial summary judgment on all claims other than malfeasance and breach of fiduciary duty. In large part, he argues that the State has not provided evidence of an injury to its business or property proximately caused by Moore's alleged racketeering activity. Because the Court accepts Moore's argument on this issue, summary judgment is granted with respect to Counts I–V, VIII, and IX of the State's Amended Complaint, and those counts are dismissed with prejudice.[1] Summary judgment is denied, however, with re-

---

1. Because the injury and proximate cause issues are dispositive, the Court does not reach the arguments raised in Moore's brief specific to 18 U.S.C. § 1962(a).

spect to the unjust enrichment claim set forth in Count XII of the Amended Complaint.

## FACTS

For the purposes of this motion only, the Court accepts the following facts as true:

During his 1984 campaign for Governor of West Virginia, Moore accepted several cash contributions in violation of state election laws. He took this money for personal use and did not disclose it on his campaign finance disclosure statements. Additionally, he did not report the windfall on his 1984, 1985 or 1988 tax returns.

Pursuant to W.Va.Code § 23–4B–1, *et seq.*, the State of West Virginia operates a coalworkers' pneumoconiosis fund ("the black lung fund," "the coal workers fund," or "the fund"). The fund provides "benefits to coal miners who are totally disabled by pneumoconiosis and to eligible dependents of coal miners whose deaths were due to pneumoconiosis or who were totally disabled from pneumoconiosis at the time of their deaths." W.Va.Code § 23–4B–1. Money for the fund comes from premiums paid by employers who subscribe, W.Va.Code § 23–4B–6, and the fund is administered by the Commissioner of the Bureau of Employment Programs. W.Va.Code § 23–4B–7. Employers may withdraw from the fund and self-insure, but in order to do so, they must receive approval from the United States Department of Labor ("DOL"). Once a company self-insures, the fund is released from all liability for claims made by employees of that company.

Until July 1, 1985, pursuant to a policy not explicitly authorized by statute or regulation, the coal workers fund provided certain refunds to employers who obtained self-insured status from DOL. The refunds equalled the amount of premiums that the employer had paid while subscribing to the fund. Once the State received word from DOL that a compa-

ny had qualified for self-insured status, the State would issue a refund check from the fund. On July 1, 1985, the fund enacted an emergency rule prohibiting refunds of paid premiums into the black lung fund.[2] At the same time the emergency rule went into effect, the Fund began the process of adopting a permanent rule identical to the emergency rule.

On October 1, 1985 a group of coal companies ("the Adventure Resources Group") owned by defendant H. Paul Kizer ("Kizer") obtained self-insured status from DOL. On October 8, 1985, the Adventure Resources Group received a $2.2 million refund of paid premiums from the fund. This refund was provided during the period in which such refunds supposedly were prohibited by state law. At some later date, Moore received a portion of this refund as a kickback from Kizer.

In January of 1986, the black lung fund amended its rules and reinstated the previous policy of permitting premium refunds to companies which had been certified for self-insured status by DOL. This revision remained in effect for only three months—from January 16, 1986 until April 16, 1986. After April 16, 1986, refunds were once again prohibited. No evidence before the Court indicates that Moore was involved in the promulgation or adoption of these rule changes.

As Governor of West Virginia, Moore had no authority over or control of DOL. John H. Kozak, a state employee familiar with the administration of the black lung fund, reviewed DOL files and found nothing to indicate that DOL's certification of the Adventure Resources Group for self-insured status was mistaken or improper. Additionally, no evidence before the Court demonstrates that Moore improperly interfered with DOL officials in order to convince them to approve Kizer's application for self-insured status.[3]

---

**2.** Refunds of "unearned" premiums were not discontinued. When a company withdraws from the fund, its unearned premium is the money already paid for coverage beginning after the withdrawal date. For example, if an employer became self-insured on July 1, but had paid for coverage through August 1, the unearned premi-

um would be the payment for coverage from July 1 to August 1.

**3.** The State relies on Kizer's grand jury testimony as evidence of Moore's improper meddling on behalf of Kizer. This testimony is inadmissible hearsay against Moore. The only hearsay exception remotely applicable to Kizer's testimony is

Moore did, however, become involved with an environmental enforcement issue at one of Kizer's mines. After Kizer purchased the mine and tried to begin operations, state officials informed him that it could not be opened until certain environmental problems were corrected. Upon learning of the situation, Moore told state officials to open the mine and give the company six months to cure any environmental problems.

## ANALYSIS

■ In civil RICO cases, a plaintiff must show that he suffered an injury to his business or property proximately caused by the defendant's racketeering activities. Because the State cannot meet this burden, Moore's motion for partial summary judgment is granted in substantial part.

### A. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are material if they might affect the outcome of the case; there is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A party, like the plaintiff, opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Furthermore, to defeat the defendant's summary judgment motion, the plaintiff must produce some evidence establishing every element on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

In considering the defendant's summary judgment motion, the Court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994).

### B. INJURY REQUIREMENTS UNDER CIVIL RICO

■ Section 1962 of United States Code Title 18 makes it unlawful for any person to engage in racketeering activity affecting interstate commerce. Additionally, it is unlawful to invest money received from racketeering activities in an enterprise affecting interstate commerce. 18 U.S.C. § 1962. The code further provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains ..." 18 U.S.C. § 1964(c). This statutory language "requires the plaintiff to make two closely related showings: (1) that he has suffered injury to his business or property; and (2) that this injury was caused by the predicate acts of racketeering activity that make up the violation of § 1962." *Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir.1988). These injury and proximate cause requirements are elements of standing. A plaintiff in a civil RICO action "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, SPRL v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3284–85, 87 L.Ed.2d 346 (1985).

Moore argues that the State has suffered no injury to its business or property as a result of his alleged racketeering activity because his retention of the Kizer payment and illegal campaign contributions did not divert money from the state. Moreover, the State of West Virginia is released from all liability

F.R.E. 804(b)(1). However, Moore had no opportunity to cross examine Kizer before the grand jury. The Court declines to invoke the catch-all exceptions of F.R.E. 803(24) or 804(b)(5). The State also relies on Moore's guilty plea for evidentiary support. However, by his guilty plea, Moore has only admitted to ex-

torting money which was not lawfully due and owing to him. The plea does not establish that Moore in any way interfered with DOL. In fact, even if the Court were to accept as established the facts asserted by the U.S. Attorney at Moore's Rule 11 plea hearing (which it does not) nothing indicates that Moore interfered with DOL.

for claims made by a company's employees against the black lung fund once the Department of Labor has certified that company for self-insured status. Therefore, according to Moore, even the $2.2 million payment to Kizer in violation of state law did not injure the State's business or property.

The State sets forth four different theories regarding the manner in which Moore's alleged racketeering activity damaged the its business or property. First, the State contends that Moore's racketeering activities caused a $2.2 million payout from the black lung fund in violation of state law. Second, the State argues that it has been damaged by virtue of the salary and benefits paid to Moore, an employee who breached his duty of loyalty to the State. Third, the State contends that the alleged bribe payment made by Kizer to Moore and the illegal campaign contributions received by Moore constitute damages that it may recover pursuant to RICO. Finally, the State claims that Moore failed to pay taxes owed to the State, thereby inflicting an injury on the State's business or property. While the Court accepts that all of these types of damage claims may be asserted at common law, they are insufficient in a RICO action.

### 1. The Black Lung Fund Payment

██ The State's $2.2 million dollar payment out of the black lung fund represents the most obvious source of damage to the State's business or property as a result of Moore's racketeering activity. According to the State, Moore's improper conduct prompted the State to make a large payment out of the fund in violation of state law. Thus, under the State's theory, it has suffered a $2.2 million injury, all of which is subject to treble damages under RICO.

However, to determine the true nature of the State's injury, the Court must examine the purpose of the black lung fund. The fund is used to pay claims made by employees of companies which subscribe to it. Once a company becomes self-insured, the fund is no longer liable for claims made by that company's employees. Therefore, once Kizer became self-insured, the State was no longer responsible for any black lung claims made by employees of Kizer companies.

The State contends that state law authorizes the transfer of excess black lung funds into other state funds in order to meet budgetary shortfalls in other governmental programs. In fact, a portion of the surplus from the black lung fund was transferred in 1992 "for the use of the financially troubled worker's compensation fund." (July 10, 1995 Aff. of John H. Kozak at ¶ 3). Therefore, if the money had been in the fund, the State would have been able to transfer it to help cover the shortfall.

The State's theory of damages simply is not supported by the evidence. Although the Adventure Resources Group refund violated state law at the time it was made, the regulations changed approximately three months later. Under the window of opportunity provided by the amended emergency rule, Kizer's companies would have qualified for a refund in January of 1986 because they had been approved by the Department of Labor for self-insured status. Therefore, the $2.2 million would not have remained in the fund until 1992 when money was transferred to cover a shortfall in the workers' compensation fund.

Moreover, the causal chain asserted by the State is too weak to meet the proximate cause requirement for standing under civil RICO. The State has the burden to present some evidence showing that Moore's racketeering conduct caused the coal workers' fund to approve the Kizer refund. As noted by the Fourth Circuit, the Court must examine "whether the conduct [engaged in by the defendant] has been so significant and important a cause [of the injury] that the defendant should be held responsible." *Brandenburg*, 859 F.2d at 1189, quoting Prosser and Keaton, *Torts*, § 42, p. 272 (5th Ed.1984).

With respect to the refund, DOL officials, not Arch Moore or any other employee of the State of West Virginia, made all of the important decisions. Under the State's program, refunds were available to self-insured companies until July 1, 1985 and between

January 16 and April 16, 1986.[4] Once a company received an approval letter from DOL, the State issued a check. Thus, unless the State can present some evidence that Moore's racketeering activities caused DOL to grant self-insured status to Kizer's companies, the causal requirement for RICO damages has not been met.

The State has presented no evidence regarding DOL's process for evaluating Kizer's application to become self-insured. No deposition or affidavit of a DOL employee is before the Court. Moore obviously had no control over a federal agency, and the State's own witness, after reviewing the file, found nothing improper about DOL's decision.

According to the complaint, Moore's intervention with the Department of Natural Resources allowed Kizer's mine to continue operating. This, in turn, provided Kizer with the financial resources necessary to gain DOL approval. More specifically, the complaint alleges that "the closure [of Kizer's mine] would have jeopardized the Kizer coal companies' ability to receive Department of Labor approval to become self-insured." (Am.Compl. at ¶ 60). This theory might succeed if the State could present one shred of evidence to support it. However, no one from DOL has provided a statement indicating that Kizer would not have received self-insured status if the Kizer mine had been closed.[5]

In sum, the State has the burden to present at least some evidence showing that Moore's conduct was so significant and important a cause of the refund that he should be held liable. Given the complete lack of evidence regarding DOL's process for approving Kizer's self-insurance application, the State has not met its burden.

4. Apparently no company applied for a refund during the 1986 window of opportunity.

5. Again, Kizer's grand jury testimony is inadmissible hearsay. Moreover, Kizer's opinions on the subject are irrelevant since DOL, not Kizer, made the decision.

6. According to Moore, once services have been rendered by a public official, that official's compensation cannot be taken away by subsequent

■ The State also relies for damages on the common law theory that a fiduciary may be liable for gains made by a third party as a result of the fiduciary's breach of duty. *Gelfand v. Horizon Corp.*, 675 F.2d 1108, 1111 (10th Cir.1982). This certainly is a strong argument in favor of damages on the state law claim for breach of fiduciary duty. The State, however, asks the Court to hold that any damages compensable under a common law theory can also be used as a basis for standing in civil RICO claims. As noted below, the Court refuses to accept such an expansive view of civil RICO.

### 2. Salary and Benefits Paid to Moore

■ As a second basis for injury to business or property, the state points to the salary and benefits paid to Moore while he was Governor. Moore contends that the State would have made those payments irrespective of his racketeering activities. Assuming Moore became Governor solely as a result of his alleged fraud, the State still suffered no damages—it would have paid a Governor's salary even if Moore had not committed fraud and another candidate had taken the office.

The State notes correctly that a disloyal agent forfeits compensation during the period of his disloyalty. The Court certainly agrees that on a breach of fiduciary duty theory, the State could collect part of Moore's salary as damages.[6] The Court holds, however, that RICO claims do not necessarily encompass all common law theories of damages. Admittedly, other courts have held that "[s]alary payments to an employee who either fails to perform his duties or performs them corruptly may be recovered from the employee under RICO." *City of New York v. JAM Consultants, Inc.*, 889 F.Supp. 103, 105 (S.D.N.Y. June 16, 1995).

law or action by the state. This argument is without merit. No case cited by Moore involves a public official who breached his fiduciary duty to the state or local government that employed him. Basic principles of agency law suggest that an employer may recover part of the salary paid to an employee who violates his duty of loyalty. Public officers in West Virginia owe "an undivided duty of loyalty to the public." *Graf v. Frame*, 177 W.Va. 282, 352 S.E.2d 31, 36 (1986).

*See also, Swig Weiler & Arnow Mgmt. v. Stahl,* 817 F.Supp. 400, 403 (S.D.N.Y.1993); *City of New York v. Bower,* No. 89 Civ. 4179, 1991 WL 19810, *1 (S.D.N.Y. Feb. 1, 1991); *County of Cook v. Lynch,* 620 F.Supp. 1256, 1257 (N.D.Ill.1985). These cases are based on the theory that "an employee who is disloyal to the interests of his employer forfeits his right to compensation for services rendered by him." *JAM Consultants,* 889 F.Supp. at 105.

This Court chooses to take a more narrow view of civil RICO. The statute and the case law make clear that the plaintiff must show an injury to business or property caused by the racketeering activity of the defendant. Thus, the statute looks at the financial position of the plaintiff. Common law equitable doctrines, on the other hand, often focus on the defendant, forcing him to give up ill-gotten gains. The State may certainly pursue Moore's salary on the common law claims, but RICO is inappropriate.

At least one other court has taken this narrower approach to RICO. In *Curiale v. Capolino,* 883 F.Supp. 941 (S.D.N.Y.1995), the Superintendent of Insurance of the State of New York brought a RICO claim against a corrupt former employee. The employee had hired a real estate broker to assist the agency in finding rental office space even though the agency could have conducted the transaction without the aid of a broker. The employee received a kickback of almost one-half the broker's fee in return. The Court found that under RICO, the agency could collect as damages the amount that the agency needlessly paid for a broker. Additionally, on unjust enrichment and breach of fiduciary duty claims, the agency was entitled to collect part of the kickback and part of the corrupt employee's salary. The court refused, however, to treble the damages derived from common law theories, holding that the "amount allocable to the kickback was not a loss sustained by the plaintiff and

therefore is not subject to trebling under RICO." *Id.* at 949.

### 3. Illegal Payments Received by Moore

■ The State also argues that it is entitled to recover the kickback paid to Moore by Kizer and the illegal campaign contributions accepted by Moore.[7] Some courts have held that these types of damage claims are sufficient to establish standing under RICO. *See City of New York v. CitiSource,* 679 F.Supp. 393 (S.D.N.Y.1988) (holding that defendant employee's receipt of bribes establishes injury to property or business required by RICO). For the reasons noted above, the Court rejects this theory for RICO damages, but permits the State to go forward with its state law causes of action.

### 4. Lost Tax Revenue

■ Finally, the State maintains that Moore's racketeering activities caused a loss of tax revenue.[8] In making this argument, the State relies upon the affidavit of Lydia S. McKee ("McKee"), the Deputy Secretary/Assistant Tax Commissioner for the State of West Virginia. According to McKee, "the starting point for computation of West Virginia taxable income is federal adjusted gross income." (McKee Aff. ¶ 6). Therefore, "[f]ailure to include income in computing federal adjusted gross income would result in a like underreporting for state personal income taxes." *Id.* Having examined the indictment and plea colloquy, McKee determined that Moore understated his income for the tax years 1984, 1985, and 1988. Based upon her investigation, McKee found that Moore owes an additional $43,533.83 in state taxes.

McKee's analysis relies on an assumption unsupported by the evidence. As anyone who has filed a form 1040 knows, tax computation can be a complicated business. Even if Moore failed to report certain campaign contributions as income, that additional gross income would not necessarily translate into

---

7. The State also refers to a $50,000 "campaign contribution" Kizer made in exchange for a promise of a pardon and the payments received under Moore's 1988 retainer agreement with Kizer. The Court has searched in vain for some admissible evidence in the record supporting these assertions.

8. The Court notes that the State never made any allegation along these lines when the suit was filed in 1992.

additional taxable income. Moore might have been able to make use of deductions or other offsets to reduce his tax liability. To carry its burden on this issue, the State would need to produce some audit evidence indicating that Moore failed to pay sufficient tax during the years in question. The State has presented no such evidence. Moreover, to the extent that West Virginia relies on federal adjusted gross income to determine state taxable income, the State should be bound by the federal government's determination of whether or not Moore owes additional tax. To date, the federal government has found no shortfall on Moore's part. (July 14, 1995 Aff. of Moore at ¶ 6).

The only evidence filed by either party regarding Moore's tax liability comes from Moore himself. He states the following in his July 14th, 1995 affidavit:

> I did not understate may taxable income for the years 1984, 1985, and 1988.
>
> I did not fail to pay all federal and state tax due and owing on my income reported for 1984, 1985, and 1988.
>
> The State of West Virginia has not initiated or maintained any administrative proceeding for any tax allegedly due and owing by me to the state.
>
> The federal government has never initiated or maintained any assessment or collection against me with respect to the income or years at issue.

(July 14, 1995 Aff. of Moore at ¶¶ 3–6).

The Court simply cannot find an issue of material fact on Moore's tax liability. The State has presented evidence, by virtue of the collateral estoppel effect of Moore's guilty plea, that Moore failed to report certain cash payments as income. The State has never presented evidence that Moore's failure to report those payments increased his tax liability. Through an audit, the State certainly could have tried to gather that evidence. For whatever reason, no such effort was made. Moore, on the other hand, has presented evidence through his affidavit that he owed no additional tax.

Even if it were determined that Moore owed additional tax, the Court is not convinced that civil RICO is an appropriate method for the State to use in recouping that loss. Admittedly, the Seventh Circuit has held that a state tax agency may use civil RICO to punish tax evaders. *Ill. Dept. of Rev. v. Phillips,* 771 F.2d 312 (7th Cir.1985). However, not all courts have interpreted RICO so broadly. *See State of Mich. Dept. of Treasury v. Fawaz,* 653 F.Supp. 141 (E.D.Mich.1986), *aff'd,* 848 F.2d 194, 1988 WL 44736 (6th Cir.1988) (holding that the Revenue Division of the Michigan State Treasury Department was not a person having standing to bring a civil RICO action against a state tax violator). The State of West Virginia could have pursued Moore under state law remedies to retrieve any tax he owed but failed to pay. West Virginia Code § 11–10–1, *et seq.* To this date, West Virginia has failed to avail itself of this option. As such, the State cannot now claim an injury to its business or property and invoke the jurisdiction of the federal courts on a RICO claim in order to collect past due taxes.

In sum, the State has persuasively argued the damage element for several of its state law claims. The Court refuses, however, to extend civil RICO in the manner suggested by the plaintiff.

## C. STATE LAW CLAIMS

As previously stated, Moore does not move for summary judgment on the State's claims for breach of fiduciary duty and malfeasance in office. Moreover, given the State's pending motion to amend the complaint, the Court will refrain from addressing the State's breach of contract, civil conspiracy and punitive damages claims until such time as that pending motion has been resolved. As for the remaining state law claims, the Court enters summary judgment for Moore on the actual and constructive fraud claims, but denies summary judgment on the unjust enrichment claim.[9]

---

**9.** The Court rejects Moore's argument that the state law claims are barred by the applicable statute of limitations. These are fraud claims, and the statute of limitations for a cause of action based on fraud does not begin to run until the injured party knew or should have known of its injury. *Stemple v. Dobson,* 184 W.Va. 317, 400 S.E.2d 561, 565 (1990). According to the

### 1. Actual Fraud

■ Under West Virginia law, actual fraud is defined as "intentional deception to induce another to part with property or to surrender some legal right, and which accompanies the end designed." *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 285 S.E.2d 679, 683 (1981). To survive summary judgment on its actual fraud claim, the State must demonstrate a genuine issue of material fact as to the following elements of fraud:

> (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; (3) that plaintiff relied on it and was justified under the circumstances in relying upon it; and (4) that he was damaged because he relied upon it.

*Horan v. Turnpike Ford, Inc.* 189 W.Va. 621, 433 S.E.2d 559, 563 (1993) (citation omitted).

According to the State, Moore committed a fraud upon the State of West Virginia by accepting bribes and unlawful campaign contributions and failing to disclose such payments. The State further claims that, in reliance upon and as a proximate consequence of these alleged misrepresentations, it paid Moore his salary and conferred upon him other benefits of the office of Governor. (Am.Compl. at ¶¶ 131–32).

Even assuming that Moore perpetrated a fraud upon the State by accepting bribes and unlawful campaign contributions, the State has not raised genuine issues of material fact as to whether it relied on Moore's actions and was damaged thereby. As explained above, the State would have paid the Governor's salary regardless of Moore's racketeering activities—indeed, regardless of whether Moore was Governor. Moreover, to the extent that Moore's "disloyalty" may entitle the State to recover part of Moore's salary as Governor, that argument is more properly raised in the context of the State's breach of fiduciary duty and malfeasance claims. Thus, the State has failed to demonstrate a triable issue of fact as to the reliance and damages elements of actual fraud. Accordingly, the Court must enter summary judg-

ment for Moore on Count VIII of the Amended Complaint.

### 2. Constructive Fraud

■ The Supreme Court of Appeals of West Virginia has defined constructive fraud as "a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Stanley*, 285 S.E.2d at 683 (citations omitted). Constructive fraud exists in cases "in which conduct, although not actually fraudulent, ought to be so treated [because it] has all the actual consequences and legal effects of actual fraud." *Id.* (citation omitted). Thus, while constructive fraud does not require proof of fraudulent intent, *id.*, it does require a showing that the plaintiff relied upon and was damaged by the conduct that should be perceived as fraudulent.

In Count IX of the Amended Complaint, the State alleges that Moore's actions as Governor "tended to deceive and mislead the State and its citizens, violated public and private confidence, and/or injured public interests that resulted in damage to the State and its citizens." (Am.Compl. at ¶ 135). Again, even if Moore's racketeering activities were considered evidence of constructive fraud, the State has not presented genuine issues of material fact as to whether it relied upon and was damaged by Moore's seemingly fraudulent conduct.

As discussed previously in the context of the civil RICO claims, the State has not established that it was in fact damaged by the Kizer refund, or that it paid this refund in reliance on Moore's racketeering activities. Also, just as the State failed to show that it could recover Moore's salary as Governor on an actual fraud theory, so the State cannot demonstrate that Moore's salary constitutes damages recoverable through a constructive fraud claim. Similarly, the State has not illustrated how it relied upon Moore's receipt

State, Moore fraudulently concealed the cause of action, and that the State did not learn of it until Moore was indicted in April 1990. This conceal-

ment tolled the statute of limitations. *Sattler v. Bailey*, 184 W.Va. 212, 400 S.E.2d 220, 227–28 (1990).

of bribes and illegal campaign contributions to the extent that it suffered damages. Finally, this Court has previously explained that there is insufficient evidence to support the State's claim that it lost state tax revenue because of Moore's activities. Indeed, even if there were merit to the state tax claim, a constructive fraud suit is not the appropriate vehicle for recovering any back taxes allegedly owed by Moore.

In summary, there are no genuine issues of material fact as to whether the State relied on Moore's allegedly fraudulent conduct and was damaged thereby. Therefore, Moore is entitled to summary judgment on Count IX of the Amended Complaint.

### 3. Unjust Enrichment

Moore further claims that he is entitled to summary judgment on the unjust enrichment claim set forth in Count XII of the Amended Complaint. According to Moore, where a party (the payor) engages in conduct that unjustly enriches a second party (the payee), only the payor may assert a claim for unjust enrichment; moreover, the payor cannot maintain its claim against any party but the payee. Moore contends that the State lacks standing to raise an unjust enrichment claim for illegal campaign contributions Moore received, because the State was not the payor of those contributions. Similarly, Moore argues that the State cannot recover the black lung refund on an unjust enrichment theory, since Moore was not the payee of the refund.

While these arguments seem plausible on their face, Moore has grossly mischaracterized the cases he cites to support these assertions. For instance, Moore cites St. Clair v. St. Clair, 166 W.Va. 173, 273 S.E.2d 352 (1980), for the proposition that a party who is not the payor of the payment constituting unlawful enrichment lacks standing to assert an unlawful enrichment claim. In St. Clair, a woman engaged in divorce proceedings sought to impress a constructive trust upon property that her estranged husband had purchased in his own name. Although the West Virginia Supreme Court of Appeals ultimately refused to impose a constructive trust, it never stated, as Moore suggests,

that the wife could not pursue her claim because she had not been the "payor" in the property transaction. To the contrary, the court held that the wife would have prevailed if she had demonstrated her husband had been unjustly enriched: "[t]o invoke the law of restitution or unjust enrichment to impose a constructive trust upon property of another, it is necessary that it be shown that one party has been unjustly enriched." Id., 273 S.E.2d at 355. Thus, Moore's interpretation of St. Clair is completely off base.

Moore does correctly state the holding of Prudential Insurance Company v. Couch, 180 W.Va. 210, 376 S.E.2d 104 (1988). In Prudential, the West Virginia Supreme Court of Appeals did rule that where an insurance company (the payor) mistakenly pays benefits to a third party (the payee), it generally cannot maintain a suit for restitution against a party other than the payee. In suggesting, however, that this general rule is an absolute without any exceptions, Moore goes too far. In fact, the Prudential court recognized that a suit for restitution can be maintained against a party who is not the payee if that party has been unjustly enriched. The court further elaborated on the definition of unjust enrichment:

A person may be unjustly enriched not only where he receives money or property, but also where he otherwise receives a benefit. He receives a benefit where his debt is satisfied or where he is saved expense or loss.

Id., 376 S.E.2d at 109 (citing Blue Cross of Cent. New York, Inc. v. Wheeler, 93 A.D.2d 995, 461 N.Y.S.2d 624 (1983)). To summarize, while Moore cites St. Clair and Prudential as authority that the State cannot assert an unlawful enrichment claim against him, these cases actually demonstrate that the State could recover damages against Moore on an unlawful enrichment theory.

Applying St. Clair and Prudential to the present case, the Court finds that the State has presented a genuine issue of material fact as to whether Moore was unjustly enriched through his conduct as Governor. After all, it is undisputed that Moore received unlawful campaign contributions, as well as a substantial payment from Kizer. Because

the State could persuade a jury that those payments constituted unjust enrichment, the Court will permit the State to proceed to trial on this claim. Accordingly, the Court denies Moore's motion for summary judgment on Count XII of the Amended Complaint.

## CONCLUSION

The Court declines to apply civil RICO and fraud in the manner requested by the State. Therefore, Moore's motion is granted with respect to the RICO counts, the actual fraud count, and the constructive fraud count of the Amended Complaint. The motion is denied with respect to the State's unjust enrichment claim.