535 S.E.2d 719

**LAWYER DISCIPLINARY BOARD, Respondent,**

v.

**Truman Lynch SAYRE, a Former Member of the West Virginia State Bar, Petitioner.**

No. 24483.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 11, 2000.

Decided Feb. 18, 2000.

---

Bruce A. Kayuha, Esquire, Lawyer Disciplinary Counsel, Charleston, West Virginia, Attorney for Petitioner.

John N. Charnock, Esquire, Charnock & Charnock, Charleston, West Virginia, Attorney for Respondent.

PER CURIAM:

This case is before this Court upon the October 6, 1997, petition of Truman Lynch Sayre for reinstatement of his license to practice law. We referred this case to the Lawyer Disciplinary Board of The West Virginia State Bar for the development of a record and recommendation. That process

having been completed, the report and recommendations of the Hearing Panel Subcommittee ("HPS") of the Lawyer Disciplinary Board recommends that the Petitioner's law license not be reinstated at this time. Pursuant to Rule 3.33(g) of the Rules of Lawyer Disciplinary Procedure, the HPS also recommended that: 1) the Petitioner be assessed the costs of these proceedings; 2) the Petitioner engage in a program of education and counseling concerning his obligations under the Code of Professional Responsibility, his conduct in the past, and the reasons for that conduct; and 3) the Petitioner be reconsidered for reinstatement at such time that he can demonstrate that he can meet the ethical obligations of an attorney, but no sooner than one year from the date that this decision becomes final. Having reviewed the parties' briefs, the record and all other matters submitted in this case, we adopt the recommendations made by the HPS, with the exception that we hold that the Petitioner may not again be considered for reinstatement until at least five years from the date that this decision becomes final.

## I. FACTS [1]

The Petitioner is seventy-three years old and was admitted to practice law in 1953. He served as a bankruptcy trustee beginning in the late 1970's and was appointed family law master in October of 1986. He consented to disbarment on September 2, 1992, following his federal conviction for embezzlement by a bankruptcy trustee.

### A. DISBARMENT

The Petitioner's conduct which resulted in his disbarment began in October of 1985, when the Petitioner transferred a total of $60,000 from two bankruptcy trust accounts into his personal account. He then used the money for a business venture with Herman G. Hendricks and others to construct and operate an EconoLodge motel in North Beckley, West Virginia. The Petitioner re-

paid most of the $60,000 on December 10, 1985, by obtaining a check from Herman Hendricks, depositing it into the Petitioner's personal account and then writing two checks to the trust accounts.

The Petitioner withdrew another $15,000 from one of the bankruptcy trust accounts on December 31, 1985, and purchased a cashier's check, which he then deposited into a motel business account. He repaid the $15,000 to the trust account on April 30, 1986, using the proceeds from a bank loan made to the motel business.

On May 22, 1987, the Petitioner diverted $12,000 from one of the trust accounts to repay a loan from a client. The Petitioner combined the $12,000 with an additional $3,000 from the client to purchase a cashier's check for $15,000 to settle unrelated business litigation of the client. Additionally, the Petitioner failed to pay a bankruptcy estate disbursement of $14,244.36 to the Workers' Compensation Fund as directed by the Bankruptcy Court in its general disbursement order of June 19, 1987.

### B. REINSTATEMENT HEARING

At the reinstatement hearing, a number of individuals testified on the Petitioner's behalf that the Petitioner was well-liked and involved in various community activities. None of these individuals, however, appeared to have significant knowledge about the Petitioner's history of ethical violations or why he had committed those violations.

The Petitioner also failed to offer any real insight as to why he had violated ethical standards in the past, other than alluding to the possibility that his divorce was a factor. When the Petitioner was questioned as to what he had done to rehabilitate himself, he testified that the events were "better forgotten for all concerned." The Petitioner was also asked to explain his apparent false contention in the disbarment proceeding that he did not use the bankruptcy funds for his "personal purposes." [2] The Petitioner's less-

---

1. The facts are taken from the undisputed factual findings made by the HPS.

2. Not only did the Petitioner make this false contention, he also attempted to cover-up his

personal use of the funds by failing to provide the State Bar with documents from his personal accounts into which he had deposited funds from the bankruptcy trust accounts.

than-candid explanation of his mendacity was "the word personal purposes has a connotation of riotous living and that sort of thing."

Most significantly, the factual findings revealed that during the Petitioner's disbarment, he had continued to engage in misconduct. Prior to March 1990, the Bank of Raleigh obtained the first deed of trust on the Petitioner's Glade Creek Farms property. Subsequently, in March 1990, the Petitioner and Herman Hendricks used the Petitioner's Glade Creek Farms property as collateral for consolidating two outstanding loans into one loan through the Beckley National Bank, thereby creating a second deed of trust.

In 1993, the North Beckley Motel, Inc. ("Motel") obtained the first deed of trust executed by the Petitioner from the Bank of Raleigh by refinancing the loan secured by the deed of trust. The Motel secured this deed of trust in exchange for the Petitioner assigning to the Motel his shares of stock in the Motel.

Instead of assigning the first deed of trust to the Petitioner, the Motel assigned it to Rebecca Riffe, the Petitioner's daughter, without any consideration. The Petitioner testified that the assignment to his daughter was a part of a scheme designed to extinguish the second deed of trust held by the Beckley National Bank.

Subsequently, the Petitioner asked his daughter to foreclose on the Bank of Raleigh deed of trust. He also asked attorney Bruce Lazenby, who rented office space from the Petitioner's brother, to serve as substitute trustee on the Bank of Raleigh deed of trust. Mr. Lazenby was aware of the second lien on the property held by Beckley National Bank; but, he did not directly notify Beckley National Bank, because he understood that the bank had never served a written request for notice of default on the Bank of Raleigh.

The Petitioner paid the expenses of the sale and arranged for Floyd M. Sayre, III, his nephew, to appear and bid on the property on the Petitioner's behalf. Floyd Sayre was the highest bidder at $6,000. The sale extinguished the second deed of trust. The Petitioner then conveyed his interest in the Glade Creek Farms property to his daughter, Ms. Riffe. The Petitioner also arranged to sell two lots from the Glade Creek Farms property, which were now unencumbered, for the amounts of $30,000 and $60,000.

At the time of the sales, Bank One held the Beckley National Bank deed of trust in the Glade Creek Farms property. When Bank One learned of these transactions, it sued the Petitioner's daughter, as well as the purchasers of the property, in an attempt to void the sales. Bank One also sued the Petitioner on the promissory note, seeking $103,224.28, which represented the principal and interest due. Ms. Riffe and the Petitioner settled these two lawsuits with Bank One for $50,000.

Then, in August of 1995, Ms. Riffe deeded any remaining property interest in the Glade Creek Farms property back to her father as a gift. The Petitioner, in turn, sold another lot that same day for $25,000. Ms. Riffe also gave her father all of the money remaining from the first two sales.

Subsequently, on June 16, 1997, the Petitioner sued Herman Hendricks averring that the parties had jointly executed a promissory note to Beckley National Bank in 1990. The Petitioner alleged in the complaint that Mr. Hendricks owed him one-half of $103,224.28, which was the original amount of the promissory note. This allegation was simply false, because the Petitioner had paid Bank One $50,000 to satisfy the debt, not the original amount of the note. Once again, in the Petitioner's affidavit executed in support of default judgment[3] against Mr. Hendricks, the Petitioner misrepresented, under oath, that Mr. Hendricks owed him one-half of $103, 224.28.[4]

### C. HPS' RECOMMENDATION

Based upon the above-mentioned factual findings made by the HPS, the HPS recom-

---

3. Mr. Hendricks did not file an answer to the complaint, because he believed that he had discharged the promissory note in bankruptcy.

4. The Petitioner attempted to justify his entitlement to $51,612.14 on the grounds that Mr. Hendricks owed him money for other reasons. None of the other reasons, however, were alleged either in the complaint or the affidavit.

mended that Mr. Sayre's petition for reinstatement be denied, reasoning, in part, that:

> After his disbarment in 1992, he set out to extinguish a second deed of trust with the goal of persuading a bank to reduce his indebtedness and to permit him to sell three parcels of property without encumbrance for $115,000. To accomplish this result, he engaged in a clever, but deceptive scheme, involving his own daughter that, in the opinion of the Hearing Panel Subcommittee, is inconsistent of the ethical standards expected of an attorney and contrary to Rule 8.4 of the Rules of Professional Conduct.
>
> Having reduced his indebtedness to the Bank by more than 50%, Mr. Sayre caused a misleading lawsuit to be filed that falsely claimed that he had paid the Bank the full amount of the debt. He then executed and filed an equally misleading affidavit, under oath, to the same effect which caused the Court to enter an Order awarding him damages that he knew were not justified by the facts. Such behavior is contrary to that expected of an attorney pursuant to Rule 3.3(a), Rule 3.4(b), Rule 8.4(c) and Rule 8(d) of the Rules of Professional Conduct[.]

## II. DISCUSSION

The only issue before the Court is whether the evidence before the HPS supported its recommendation that the Petitioner's license to practice law not be reinstated. The Petitioner asserts that his law licence should be reinstated, with conditions, because the decision of the HPS was not based on the evidence.[5] In contrast, the Respondent maintains that the Petitioner has not met his burden of proving rehabilitation, which is a prerequisite to reinstatement of his law license.

■ The following standard of review governs cases arising from the lawyer disciplinary process:

> "A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

Syl. Pt. 2, *Lawyer Disciplinary Bd. v. Vieweg*, 194 W.Va. 554, 461 S.E.2d 60 (1995).

■ Whether a lawyer's license to practice law should be reinstated, following disbarment, is determined as follows:

> The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment he must demonstrate a record of rehabilitation. In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration.
>
> Rehabilitation is demonstrated by a course of conduct that enables the court to

---

**5.** The Petitioner also maintains that the HPS grossly failed to conduct its dealings with the Petitioner within the reasonable bounds of due process. This argument centers upon the fact that it took nine months from the filing of the petition on October 6, 1997, until the first hearing occurred on July 20, 1998. At the close of the July 1998 hearing, the HPS requested Disciplinary Counsel to obtain further information. As a result of the HPS' request, Disciplinary

Counsel sought another evidentiary hearing. The Petitioner maintains that "[h]ad Disciplinary Counsel pursued the matter with any diligence during the nine months ... no second hearing would have been required." Thus, the Petitioner "objects to all items pertaining to taxation of costs assessed for the second hearing." We find the Petitioner's argument on this issue is without merit.

conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law he will engage in unprofessional conduct.

Syl. Pts. 1 and 2, *In re Brown,* 166 W.Va. 226, 273 S.E.2d 567 (1980).

The evidence adduced by the HPS is devoid of any indicia of rehabilitation or other assurances that the course of conduct engaged in by the Petitioner which caused the disbarment is unlikely to occur again. To the contrary, during his disbarment, the Petitioner continued to engage in unscrupulous behavior. Moreover, the Petitioner's continued conduct is substantially similar to that for which he was disbarred in that the Petitioner continues to misappropriate money from innocent parties for the Petitioner's own use. This type of conduct belies the Petitioner's claim that he is entitled to have his law license reinstated.

 Given that the Petitioner has not ceased his continued scheming, this Court is left to conclude that any reinstatement of the Petitioner's law license would have a "substantial adverse effect on the public confidence in the administration of justice...." *Id.* at 226, 273 S.E.2d at 567, Syl. Pt. 1, in part. As we reiterated in syllabus point six of *Lawyer Disciplinary Bd. v. Battistelli,* 206 W.Va. 197, 523 S.E.2d 257 (1999), " '[d]isbarment of an attorney to practice law is not used solely to punish the attorney but is for the protection of the public and the profession.' Syl. Pt. 2, *In re Daniel,* 153 W.Va. 839, 173 S.E.2d 153 (1970)." It is clear from the record before us that the Petitioner's previous disbarment has not deterred him from engaging in conduct which violates the ethical standards expected of attorneys. Thus, Petitioner's continued unprofessional, unethical, and possibly criminal conduct necessitates the denial of reinstatement of the Petitioner's law license. This Court is obligated to deny licensing an attorney who does not possess the requisite moral character, integrity, and legal competence as a means of protecting the unsuspecting public, as well as the legal profession itself. *See id.*

In view of the foregoing, the recommendation of the HPS that the Petitioner's law license not be reinstated at this time is hereby adopted. Given this Court's grave concern over the Petitioner's conduct since disbarment, our firm conviction is that the Petitioner must be precluded from seeking reinstatement of his law license for a period of not less than five years. Perhaps the Petitioner will then be able to show that he has become truly rehabilitated and that as a result of education and counseling programs, he understands his obligations under the Code of Professional Responsibility and the enormity of his prior misdeeds. Finally, the Petitioner is ordered to pay the costs of these proceedings.

The Petitioner's request for reinstatement of his law license is hereby denied.

Petition denied.

Justice McGRAW dissents.