591 S.E.2d 338

## LAWYER DISCIPLINARY BOARD, Respondent,

v.

## Arch A. MOORE, Jr., a former member of The West Virginia State Bar, Petitioner.

No. 25794.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 18, 2003.

Decided Dec. 12, 2003.

---

1. See 10 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law*, Appendix B, Table 7 (November 2003).

Starcher, C.J., concurred and filed opinion.

Davis, J., concurred and filed opinion in which Pancake, J., joined.

Maynard, J., concurred and filed opinion.

Lawrence J. Lewis, Esq., Office of Disciplinary Counsel, Charleston, for Respondent.

Rudolph L. DiTrapano, Esq., Sean P. McGinley, Esq., DiTrapano, Barrett & DiPiero, Charleston, for Petitioner.

PER CURIAM.

The petitioner, Arch A. Moore, Jr., ("the petitioner") has filed a Petition for Reinstatement seeking reinstatement of his license to practice law in West Virginia. The petition, materials related thereto gathered and submitted by the Office of Disciplinary Counsel and a report from that Office were considered by a Hearing Panel Subcommittee ("the Hearings Panel") of the Supreme Court of Appeals of West Virginia Lawyer Disciplinary Board ("the Board"). We have before us the written Recommendation of the Hearing Panel,[1] briefs from the petitioner and the Board, and voluminous materials that comprise the record below.

## I.

The petitioner was born on April 16, 1923. He served in the United States Military during World War II and was wounded in combat, earning the Purple Heart and Bronze Star for valor. This Court wishes to acknowledge and state its heartfelt apprecia-

---

1. We omit (without individually noting their omission) from our quotations from the Hearing Panel's Recommendation: (1) the citations to the record with which the Panel supported its findings; (2) some of the footnotes and page citations to legal authorities; and (3) the Recommendation's paragraph numbers. A full copy of the Recommendation and other documents related to the instant case, including the briefs of the parties, may be accessed as .pdf files—as of the time of this opinion's filing in December of 2003—from the webpage *http://www.state.wv.us/wvsca/CurrentMedia/Moore cover.htm*—or search "Moore" on the home page of the West Virginia Supreme Court of Appeals. The members of the Hearing Panel were Allan Karlin, Esq., Chair; Joyce Morton, Esq.; and Donna Donathan.

tion for the petitioner's courageous service to his country.

Following his military service, the petitioner married in 1949 and graduated from the West Virginia University College of Law. He was admitted to practice law in the State of West Virginia in 1951.

The petitioner served in the West Virginia House of Delegates, six terms as a Congressman in the United States House of Representatives, and three terms as Governor of the State of West Virginia. The Hearing Panel concluded and this Court agrees that the petitioner is an astute politician with a charismatic persona and an uncanny ability to reach across gender and income lines, all as reflected by his elected political history.

Prior to the 1990 charges that led to the loss of his law license, the petitioner had been the subject of other criminal investigations. While the factual basis for those underlying allegations was not considered by the Hearing Panel or this Court, these investigations are relevant to the present matter because they establish that the petitioner had significant experience in dealing with federal investigations, including both tax and criminal investigations, experience which can and should be considered in evaluating the petitioner's contentions about the reasons that he pled guilty to a five-count federal criminal indictment in 1990, which plea and conviction led to his disbarment.[2]

## II.

## A.

### *The Misconduct that Led to Petitioner's Disbarment*

The specifics of the petitioner's plea and conviction are as follows. On May 8, 1990, the petitioner entered a guilty plea to a five-count federal indictment charging him with mail fraud, filing false tax returns, extortion and obstruction of justice. Subsequently, the petitioner attempted to withdraw his guilty plea. His initial motion to set aside the guilty plea in the criminal proceeding was denied by the Honorable Walter E. Hoffman, United States District Judge. Subsequently the petitioner filed two post-conviction proceedings seeking to set aside the plea. These were both denied by the Honorable Richard L. Williams, United States District Judge.

As a result of his conviction, the petitioner served a period of thirty-three months incarcerated in federal prison.

The State of West Virginia also instituted a civil action against the petitioner in 1990 in the United States District Court for the Southern District of West Virginia. After discovery, motions, and partial summary judgment orders, the case was settled without an admission of liability in January 1996. The petitioner paid the State of West Virginia the sum of $750,000.00 to settle the claims.

Following his conviction, the petitioner was disbarred by Order of the Supreme Court of Appeals of West Virginia on October 31, 1991. *Committee on Legal Ethics of the West Virginia State Bar v. Moore,* 186 W.Va. 127, 411 S.E.2d 452 (1991).

■ In the instant reinstatement proceedings, the petitioner has claimed that he was factually and legally innocent of the federal charges against him, and he asserts that he erroneously or mistakenly pled guilty, based on the advice of counsel.

The Hearing Panel's Recommendation has thoroughly reviewed, in exacting detail, the factual record relating to the underlying charges to which the petitioner pled guilty,

---

**2.** According to the Hearing Panel's Recommendation (and not contested by the petitioner), in 1970, the petitioner was the target of a criminal tax investigation by the Internal Revenue Service. He was represented in the matter by William G. Hundley, the same attorney who represented him in 1989–1990 in connection with the charges that led to his disbarment. Hundley brought the criminal tax matter to a successful conclusion with only "civil exposure" to the peti-

tioner. In the mid–1970s, the petitioner was indicted by the federal government on a single Hobbs Act allegation (extortion under color of official right). He asserted his innocence, went to trial, and was found not guilty by a jury. Hundley was the petitioner's Washington counsel in the case. During this trial it was revealed, and the petitioner now admits, that at the time, he possessed $180,000.00 in cash.

and the Recommendation states the following regarding the petitioner's guilty plea:

> Moore was, at the time of his plea, a knowledgeable attorney who had previously been personally involved in an IRS investigation and a federal criminal trial. Moreover, when he agreed to plead guilty, he had the benefit of an experienced attorney with whom he had worked before and a substantial opportunity to consider the consequences of his action. Before he pled, he was interviewed by representatives of the United States Attorney. During those interviews, Moore had the opportunity to learn, from the questions he was asked, the areas the United States Attorney was investigating and some of the information that it had learned. His counsel was allowed to review recorded and incriminating conversations involving Moore and communicated the substance of those recordings to Moore who, having been present at the original event, knew that the recordings were accurate and true.

> \*　\*　\*　\*　\*　\*

The Government's factual basis for the charges to which Moore pleaded, as presented to Judge Hoffman, is found at ODC Exhibit 3, pages 24 through 30. That summary includes:

> MR. CAMPBELL: As to count one ... [t]he proof of this charge would have centered around activities engaged in during the 1984 campaign for governorship of the State of West Virginia. Specifically, the government's proof would center on one hundred thousand dollars ($100,000) in cash that the defendant, Arch Moore, personally and illegally obtained and used in a secret—what he called underground campaign for the governorship. The cash that he used and caused to be used was obtained in violation of state law. It was not reported to the Secretary of State, in violation of state law. And it was used in violation of state law, both because it was not reported which violates state law and because it was used for purposes that are illegal under the West Virginia Code, namely, to influence voters in improper ways. The mailings that were employed in furtherance of this scheme were the mailings of campaign finance reports to the West Virginia Secretary of State that omitted to mention and to record the receipt of this one hundred thousand dollars ($100,000) in cash. Those mailings occurred in December of 1984, July of 1985 following the election, and finally in April of 1987 well after the election.

> As to count two, Your Honor, which charges the defendant with extortion, in violation of the Hobbs Act, 18, United States Code, Section 1951, the government would have proved that the defendant extorted under color of official right over half a million dollars between late 1984 and October of 1985 from one Paul Kizer, who is an operator of a coal mining business in West Virginia. This occurred while the defendant was governor-elect of this state and in fact governor of this state. He obtained this money, this half a million dollars, from Mr. Kizer in return for his assistance or his promise of assistance in obtaining a refund of over two million dollars ($2,000,000) for Mr. Kizer's companies from the state pneumoconiosis fund, the black lung fund. The defendant also covered up the receipt of this money—the illegal receipt of this money through the mechanism of a fake contingent fee agreement that he had putatively with Mr. Kizer. Mr. Moore, the defendant, while governor, did assist Mr. Kizer in obtaining the refund by intervening on his behalf with the state Department of Natural Resources to prevent certain environmental action from being taken against Mr. Kizer's companies or one of his companies. The refund was in fact granted, Your Honor, in October of 1985, and the defendant, Mr. Moore, received personally five hundred and twenty-three thousand, seven hundred twenty-one dollars and forty-seven cents ($523,721.47) as a result of that action. The money that he received came from a business account of Maben Energy Corporation, Your Honor, one of Mr. Kizer's companies, which does business in interstate commerce, and therefore affected interstate commerce.

Counts three and four, Your Honor, charge the defendant with violating Title 26, United States Code, Section 7206(1), in that he filed false tax returns for tax years 1984 and 1985. The government would prove as to 1984 that the tax return was knowingly subscribed by Mr. Moore on April 15, 1985, and that the tax return contained material false information, and that it omitted certain substantial sources of income to Mr. Moore, including approximately ten thousand dollars ($10,000) in cash obtained from Samuel D'Annunzio and approximately ten thousand dollars ($10,000) in cash obtained from Talmadge Mosely. These sums were income to the defendant. They were not reported by him, and the government would have proved that, that he did that knowingly and willfully. The government would have proved similar things as to 1985. That the defendant filed that false return on August 15, 1986, and that it omitted to mention substantial sources of income to him, including fifty thousand dollars ($50,000) in cash obtained from agents of Marrowbone Development Company and two thousand, five hundred dollars ($2,500) in cash obtained from one Robert Gilliam. Those sums of cash we would have proved were income to him and were willfully and knowingly not reported and omitted from his returns, making those returns materially false.

Finally, Your Honor, as to count five of the indictment, which charges the defendant with obstruction of justice, in violation of 18, United States Code, Section 1503, the government would have proved that the defendant engaged in a series of acts in late 1989 and 1990 designed to prevent the federal grand jury sitting here in Charleston from learning of the nature of his criminal offenses, and that he attempted to do so by giving false testimony to agents of the federal government and by influencing other witnesses to do the same. This centered on three (3) sets of facts. First, Your Honor, revolving around Mr. Kizer. Mr. Kizer and Mr. Moore got together to plan a cover story, as the court put it, to cover up the circumstances under which Mr. Kizer paid Mr. Moore a hun-

dred fifty thousand dollars ($150,000) during 1989. The defendant also created and back dated certain letters in support of this cover story. The second set of facts involve John Leaberry, who managed Mr. Moore's 1988 campaign for governor. Mr. Moore met with Mr. Leaberry on January 8, 1990, to discuss the use of cash in the 1988 campaign and to plan how the two (2) of them would give false information to federal investigators about the use of that cash. That meeting, unknown to Mr. Moore at that time, was recorded by Mr. Leaberry, who was cooperating with the government under a plea agreement of his own at the time. In that meeting and on the tape, Mr. Moore talks about the fact that cash was obtained and used in the 1988 campaign and discusses how they will disguise that fact from federal investigators and how they will talk to another witness who was aware of the facts to find out what his story is so they could adjust their story to fit it. Finally, Your Honor, the defendant personally appeared on January 10, 1990, and April 9, 1990, voluntarily and gave testimony to federal officials and investigators under oath on the record. He acknowledged at the time that he wished these statements to be submitted to the grand jury, and they were. In these two (2) separate incidences of testimony, Mr. Moore falsely denied using cash in the 1988 campaign as he had planned with Mr. Leaberry, he falsely denied talking to Mr. Kizer or Mr. Leaberry at all about the investigation, and he gave further false information that understated the amount of his own cash expenditures between the years of 1983 and 1988. All of these matters were material to the grand jury, Your Honor. That is the government's factual basis.

The Court: Mr. Moore, do you agree that the summarization as presented by the government is at least substantially factually correct and that there are no variances that would affect your plea of guilty in any way to any of these counts?

*Moore: Your Honor, I believe the recital would be substantially correct.* [Emphasis added].

The Hearing Panel's Recommendation continues:

> In the proceedings before the Panel, as well as publicly, Moore has insisted that he was innocent of most of the charges to which he pled guilty in 1990.
>
> Moore's insistence that he is innocent despite the fact that he admitted his guilt, under oath in federal court, is simply not credible. At the hearing before Judge Williams on January 7, 1992, Moore was asked if he had lied under oath on prior occasions when he had admitted guilt. In response, Moore testified:
>
>> With the encouragement and coaching of my counsel I was not straightforward in my responses to Judge Hoffman.
>
> In other words, Moore attempted to place the blame for his allegedly false plea of guilty on his attorney, an explanation that is no more credible to this Panel than it was to Judge Williams.

The Hearing Panel's Recommendation states the following regarding the petitioner's attempts to withdraw his guilty plea:

> On or about June 1990, Assistant U.S. Attorney Savage advised Moore's counsel that the Government did not believe Moore had accepted responsibility. Moore's counsel then advised the Government that Moore wanted to withdraw his plea. The Court was advised on June 19 of the impending motion, and it was filed June 26, 1990.
>
> Initially, Moore argued his plea was the result of a hasty decision forced by a deadline imposed by the Government. Later, in his post-conviction hearing, he faulted his lawyer's advice as to parole eligibility, civil liability, sentencing effects of Counts One through Four (Moore claimed Hundley advised him these were mere "throwaway counts"), and advice regarding his right to withdraw the plea. In his testimony before the Panel, Moore testified that he acted "on advice of my counsel for the express purpose of withdrawing that plea at an appropriate time after he had learned as much as he could of the case that was before us at that time." He said other than his counsel's advice, there was nothing else that entered into his decision to enter the plea. Moore further contended that it was his understanding that he could withdraw his guilty plea as a matter of right and that, had he known that the right to withdraw the plea was discretionary, he would not have entered the plea.
>
> Moore now claims that his reluctance to plead was obvious at the plea hearing because he allegedly paused before pleading guilty. The Panel has only Moore's testimony on this issue and, with regard to his alleged innocence and the reasons for his plea, that testimony is not credible. Moreover, the Honorable Walter E. Hoffman, the United States District Judge who presided over the plea and sentencing, rejected Moore's attempt to set aside the plea and noted:
>
>> He [Moore] is asking for a whole lot, Mr. Hundley, when he comes in here and when he was under oath before me, to now try to say, "Well, I didn't mean that and I didn't mean that." Is there anything wrong with my questions? He said he understood every one of them.
>
> Judge Hoffman added, in rejecting Moore's motion:
>
>> There is no fair and just reason why I should permit now the withdrawal of the pleas of guilty which were made voluntarily under oath by Mr. Moore, answering every question specifically that he thoroughly understood them, and that's his position. Now he wishes to change his plea. I think that he's too late.
>
> Moore's attempt to withdraw his plea was also rejected by the Honorable Richard L. Williams, United States District Judge, who heard two separate habeas petitions. In his rejection of Moore's first habeas petition, Judge Williams concluded "Moore has introduced no evidence that substantiates his claims of innocence." Later, in ruling on Moore's second habeas petition, Judge Williams first noted that the petition was "abusive and successive," and added, "The ends of justice would not be met by addressing the merits of the petition because *Moore has failed to make a colorable showing of actual innocence.*" [emphasis in Recommendation.]

The Panel concludes that Moore's explanations for the change in his plea decision are not credible. In reaching this conclusion, the Panel relies both on Moore's demeanor at the hearing and on the substance of Moore's testimony, including the fact that his reasons have inexplicably changed over time and are inconsistent with Moore's experience and sophistication. The evidence suggests that Moore wanted to change his plea for other reasons, such as his realization that his sentence was likely to be longer than he had anticipated.

Before the Hearing Panel and this Court, the petitioner argued that his factual and legal guilt is thrown into question by the opinion in *West Virginia v. Moore*, 895 F.Supp. 864 (S.D.W.Va.1995), suggesting that the opinion largely clears him of any wrongdoing. On this point, the Hearing Panel's Recommendation states:

> ... Moore overstates the finding of that case. The lawsuit was brought against Moore to collect money paid by the State of West Virginia Occupational Pneumoconiosis Fund and others as a result of Moore's criminal conduct. Many of the counts were dismissed, but not because the Court concluded that Moore was an innocent man. Rather, the Court concluded that the State failed to demonstrate that it had actually suffered a financial loss as a result of Moore's criminal conduct. Moreover, Judge Williams concluded that there was evidence that Moore had unjustly enriched himself when he took money from Kizer and others:
>
> > ... the Court finds that the State has presented a genuine issue of material fact as to whether Moore was unjustly enriched through his conduct as Governor. After all, it is undisputed that Moore received unlawful campaign contributions, as well as a substantial payment from Kizer. Because the State could persuade a jury that those payments constituted unjust enrichment, the Court will permit the State to proceed to trial on this claim. Accordingly, the Court denies Moore's motion for

summary judgment on Count XII of the Amended Complaint.

*West Virginia v. Moore*, 895 F.Supp. at 874–875. While the State of West Virginia may have presented insufficient evidence to establish injury caused by Moore's alleged racketeering activity, the Court accepted as fact that Moore had received a portion of Kizer's refund as a kickback from Kizer and that, by his plea, Moore had admitted to extorting money which was not lawfully due and owing to him. *State v. Moore*, 895 F.Supp. at 867.

Our review of the Hearing Panel's Recommendation and the materials in the record leads us to conclude that the Hearing Panel's assessments are well-founded. Our conclusion in this regard is supported by the facts in the record before us, by the opinion of this Court in *Committee on Legal Ethics of the West Virginia State Bar v. Moore*, 186 W.Va. 127, 411 S.E.2d 452 (1991), and by the opinions of two federal judges who reviewed the petitioner's attempts to withdraw his plea.

Thus, the clearly ascertained and proven *fact* of the petitioner's extremely serious misconduct is a fundamental premise of any determination that we make in the instant case.

### B.

### *Reinstatement*

■ As to the general standards to be applied to petitions for reinstatement, the Hearing Panel stated as follows:

> The leading case interpreting the applicable standards for reinstatement appears to be *In Re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980) (*Brown II*). In that case, the Supreme Court of Appeals of West Virginia sets forth the standard for reinstatement as follows:
>
> > The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment, he must demonstrate a record of rehabil-

itation. In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration.

■ We agree with the Hearing Panel that the following Syllabus Points from *In re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980), are applicable to the instant case. (The Hearing Panel's Recommendation uses, and this Court will use, the name *"Brown II"* to identify this case—because a previous case, *In re Bonn Brown*, 157 W.Va. 1, 197 S.E.2d 814 (1973) (*"Brown I"*) dealt with the same individual.) The Syllabus Points of *Brown II* are:

1. The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment he must demonstrate a record of rehabilitation. In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration.

2. Rehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law he will engage in unprofessional conduct.

3. Absent a showing of some mistake of law or arbitrary assessment of the facts, recommendations made by the State Bar Ethics Committee in regard to reinstatement of an attorney are to be given substantial consideration.

Further discussing the standards for consideration of a reinstatement petition, the Hearing Panel's Recommendation continues:

In discussing the proper analysis for a reinstatement case, the Supreme Court of Appeals noted that applicants for reinstatement must "carry the burden of establishing their fitness to resume the practice of law." Citing decisions from other states, the Court noted "[t]his is the universal rule from other jurisdictions with only differences as to how clear the proof must be." Nothing in the other cases cited by the *Brown II* Court supports the interpretation urged by Moore. For example, in *Lester v. Kentucky Bar Association*, 532 S.W.2d 435 (Ky.1975), one of the cases cited in *Brown II*, the Kentucky Court of Appeals concluded:

A person seeking reinstatement has the burden of overcoming a prior adjudication of disqualification. The judgment of disbarment continues to be evidence against the applicant and he may overcome it only by most persuasive proof. *In re Weaks*, 407 S.W.2d 408 (Ky.1966). In order to be reinstated, it is important that the applicant's conduct and character since his disbarment have been exemplary; that he be worthy to have public confidence and trust placed in him; and that he has complied fully with the order of disbarment. *In re Nisbet*, 296 S.W.2d 465 (Ky.1956). *Additional factors which should be considered include the nature of the conduct leading to disbarment, the applicant's recognition of his wrongdoing, and his previous and subsequent conduct in regard to the practice of law.*

See also *Matter of Peterson*, 274 N.W.2d 922 (Minn.1979), another case cited in *Brown II*, wherein the Supreme Court of Minnesota also noted

. *Certainly, rehabilitation and reformation demand that the individual perceive and reject the wrongfulness of his conduct* and show in some positive way that he now has a correct sense of professional responsibility.

*Id.* at 926, emphasis added.

■ The Hearing Panel's Recommendation correctly states that *Brown II* identifies five areas that should be investigated—and the evidence, findings, and conclusions relat-

ing thereto weighed—in evaluating a reinstatement petition. These factors, however, are not exclusive. They are:

(1) the nature of the original offense for which the petitioner was disbarred, (2) the petitioner's character, maturity, and experience at the time of his disbarment, (3) the petitioner's occupations and conduct in the time since his disbarment, (4) the time elapsed since the disbarment, and (5) the petitioner's present competence in legal skills

*Brown II*, 166 W.Va. at 229, 273 S.E.2d at 568.

The Hearing Panel's Recommendation continues:

The Office of Disciplinary Counsel contends, and the Panel agrees, that, pursuant to the above cases, Moore bears the burden of proving that he presently possesses the integrity, moral character, and legal competence to resume the practice of law. This is consistent with the language from *Brown II* set forth above as well as the decisions of the Supreme Court of Appeals in other cases. *Committee on Legal Ethics v. Pence*, 171 W.Va. 68, 71, 297 S.E.2d 843, 846 (1982) (petitioner bears the burden of showing that he presently possesses the integrity, moral character, and legal competence to resume the practice of law). The Office of Disciplinary Counsel asserts this burden is at least one of "clear and convincing" evidence, the same standard applied in all disciplinary proceedings. However, the Panel need not address whether the burden is clear and convincing or a preponderance of the evidence because it concludes that Moore has failed to meet his burden under either standard.

In reaching its decision, the Panel has carefully considered the evidence of record concerning the charges to which Moore pled guilty and the facts surrounding those charges, the plea negotiations, Moore's subsequent plea, and Moore's numerous attempts to rescind his guilty plea. While the details of the original charges and subsequent proceedings might not be critical to the decision in every reinstatement case involving prior criminal conduct, Moore's Petition for Reinstatement requires the Panel to consider the underlying charges for several reasons. First, as noted above, opinions of the Supreme Court of Appeals establish that the severity of the underlying offense is a consideration in the reinstatement decision. *Brown II* at 234–235, 273 S.E.2d at 571–572 ("Obviously, the more serious the nature of the underlying offense, the more difficult the task becomes to show a basis for reinstatement"). In this case, those crimes, taken together, were severe. Moreover, Moore's attempt to obstruct the federal investigation by lying under oath and encouraging others to join him in doing so is particularly egregious for anyone, let alone an attorney.

Second, Moore insists that he is innocent of most, if not all, of the underlying charges, thus raising the questions of whether Moore has accepted the fact that the conduct and behavior that led to his disbarment was criminally or professionally wrong and whether he has recognized and addressed the personal traits that led to that conduct.

Third, Moore's prior misconduct included knowingly false testimony in his sworn statements to federal officials investigating his crimes and a lack of candor to the court during his attempts to rescind his guilty plea. This pattern of deception continued, following his conviction, in Moore's false testimony in 1992 when he was deposed in the civil case brought by the State of West Virginia and, of greatest importance, in his testimony before the Panel in this matter.

Further, the Panel has also analyzed the evidence of Moore's conduct since his conviction and his testimony before the Panel, pursuant to the five points enumerated in *Brown I* and *Brown II, supra,* and the general standard articulated in *Brown II* and reiterated in subsequent cases. *See* Syl. Pt. 2, *Lawyer Disciplinary Bd. v. Sayre*, 207 W.Va. 654, 535 S.E.2d 719 (2000); Syl. Pt. 3, *Lawyer Disciplinary Bd. v. Sayre*, *Vieweg*, 194 W.Va. 554, 461 S.E.2d 60 (1995); Syl. Pt. 1, *Committee on Legal Ethics of W.Va. State Bar v. Pence*, 171 W.Va. 68, 297 S.E.2d 843 (1982). Based upon its analysis of all of the evidence, the Panel has concluded that the

Petition for Reinstatement should be denied.

The Hearing Panel had the following to say about the *first factor* identified in *Brown II*, the nature of the original misconduct for which the petitioner was disbarred:

The original offenses for which Moore lost his law license were extremely severe and, in themselves, could justify a denial of the Petition, particularly in light of Moore's position as a public official and of his attempt to obstruct justice. As the Supreme Court of Appeals wrote in annulling Moore's law license:

As an attorney, the respondent brought to the office of governor all his prior experience and knowledge. Consequently, the acts that occurred while he was governor are intermingled with the acts performed in contravention of his law license. Once a person takes the oath to honestly demean himself in the practice of law, his existence, from that day forward or until he surrenders his license to practice law, requires that he not break any of the laws which he is sworn to uphold. This oath is the cornerstone upon which the foundation of our jurisprudence is built. Without that cornerstone, the principles of our Constitution disintegrate.

The respondent was entrusted with the right to practice law and the privilege to govern this State. He failed both. As a lawyer, he pled guilty to criminal acts that arose out of his practice of law. As former governor, he pled guilty to criminal acts that grew out of his position as governor. He violated both oaths of office. Can there be any more serious breach of trust than the violation of these two oaths?

*Committee on Legal Ethics of the West Virginia State Bar v. Moore*, 186 W.Va. 127, 131, 411 S.E.2d 452, 456 (1991).

To appreciate the severity of Moore's offenses, it is important to understand that Moore's offenses did not just involve the taking of unreported cash on an isolated occasion. Rather, Moore demonstrated a pattern of accepting cash payments for political and personal use over a period of many years without reporting the payments as income on his income tax returns or as political contributions in his campaign finance reports. His explanations for this conduct are unconvincing. For example, his claim that he thought there was no duty to report the contributions until the campaign expended the money defies credulity in light of both Moore's sophistication and his claim that he believed Craig would report the funds despite the fact that Moore never even told Craig where the money came from.

Moreover, Moore's attitude toward the cash "gifts" that he received demonstrated, in both his past testimony and his testimony before the Panel, an insensitivity to the high standards expected of an attorney, let alone a public official entrusted with the highest political office within the State. For example, Moore's testimony to the Government in 1990 that he told a donor that he would only accept an $8,000.00 gift during the 1984 campaign *in cash* because to accept a check "would have an indication that it was politically arrayed" is hardly consistent with the integrity and moral character expected of an attorney in West Virginia.

Not only did Moore profit personally and politically from large cash gifts over a period of many years, but there is also compelling evidence that Moore led others to think that they would benefit from these undisclosed and unreported "gifts" through his influence and power as Governor. This is apparent from the history of gifts to Moore from D'Annunzio and others as well as the Kizer transactions and Moore's intervention with the Department of Natural Resources on behalf of Kizer, an intervention that he admitted in 1990, but denied, under oath before this Panel.

Worse, particularly from someone who wishes to return to the practice of law, Moore actively engaged in an attempt to obstruct the investigation against him in 1990 by testifying falsely to federal investigators and by encouraging others to join him in doing so. While Moore denied, in his testimony before this Panel, that his conversation with Leaberry was an at-

tempt to obstruct justice, his denial is not credible. Comparing the transcript of Moore's tape recorded conversations with Leaberry with Moore's explanation of those conversations in his testimony before the Panel demonstrates that Moore was not only willing to conspire to fabricate testimony when facing indictment in 1990, but, sadly, that he was just as willing to provide disingenuous testimony in this proceeding in the hope of reinstating his law license.

In connection with the severity of the original offense, it is important to note that Rule 3.30 of the West Virginia Rules of Lawyer Disciplinary Procedure provides that "[a]ny conviction for false swearing, perjury or felony, and the person's prior and subsequent conduct, shall be considered in the determination of good moral character and fitness." Obviously, for an attorney, matters of false swearing are of particular concern. In Moore's case, the acts included in his offenses include both his false testimony and his attempts to encourage others to join him in testifying falsely.

Of additional concern to the Panel is Moore's attitude toward his creation of a *backdated* attorney fee contract in connection with the first Kizer transaction. Moore admits backdating the agreement:

Q. But I am correct that the agreement that was dated '83?

A. [Moore] Yes.

Q. But you prepared it in '84?

A. That's correct.

While this event occurred in 1984, the Panel is extremely concerned that *Moore testified, during the hearing in the present case, that he still believes there is nothing wrong with backdating a document to make it appear as though it were signed before he was elected Governor when, in fact, it was signed after he was elected Governor* [emphasis in original]:

Q. Was it Mr. Loy's idea to back date the agreement?

A. [Moore] I don't know. I do not think so. I think that that was my idea.

Q. Now as a lawyer, Governor Moore, don't you find it a little bit hard to justify signing an agreement in '84 and putting a '83 date on it?

A. Not if that is the true facts of the situation.

Backdating a document to make it appear as if it were signed in 1983 when, in fact, it was signed after Moore was elected in 1984, is inconsistent with the obligations of an attorney under Rule 8.4 of the West Virginia Rules of Professional Conduct. While it may be appropriate to state in a fee agreement or other legal document that it memorializes an agreement that had been reached at an earlier date, the signed document should nonetheless correctly state the date on which it was actually signed. Any attempt to make the document appear on its face as if it had been signed in October 1983, when it was actually signed late in 1984, is misleading. Moore's continuing failure to appreciate the misconduct involved in backdating a fee agreement is another reason to seriously question whether Moore has the "integrity and high moral character" that both the Bar and the public have a right to expect of those who practice law in West Virginia.

[n.3] The agreement was signed after Moore was elected Governor, but made to appear as if it been signed more than a year earlier. Obviously, Moore did not want to sign an agreement, dated after he had been elected Governor, that obligated him to help Kizer obtain a refund of funds on deposit with a state fund. As a result, he backdated the agreement. When Moore gave his sworn statement in 1990, he *denied* backdating the agreement. Later, however, after his plea, Moore admitted that he had backdated the fee agreement. Moore's backdating of the fee agreement involves "dishonesty, fraud, deceit or misrepresentation" under Rule 8.4 of the Rules of Professional Conduct. The conduct also violated Disciplinary Rule 1–102(4) of the Code of Professional Responsibility, the predecessor to the current rule which was in effect in 1984. [Emphasis in original].

Of equal importance, the West Virginia Supreme Court of Appeals has stated that misconduct by lawyers who are public officials is more egregious than that of other lawyers because . of the betrayal of the public trust. Syl. Pt. 3, *Committee on Legal Ethics v. Roark*, 181 W.Va. 260, 382 S.E.2d 313 (1989) (ethical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the office); Syl. Pt. 3, *Committee on Legal Ethics v. White*, 189 W.Va. 135, 428 S.E.2d 556 (1993). In fact, the greatest insult resulting from Moore's activities during the period that led to his annulment, and prior thereto, was to the State of West Virginia and its people.

Finally, in *Brown II*, the Court recognized that "the more serious the nature of the underlying offense, the more difficult the task becomes to show a basis for reinstatement." As discussed above, the offenses committed by Moore were extremely serious.

Considering all of these factors, the Panel concludes that the nature and severity of the original offenses, standing alone, is sufficient to deny reinstatement. Moreover, the fact that Moore continues to speak less than truthfully about the events that led to his disbarment, along with his continued failure to acknowledge and accept responsibility for what he has done, further supports the Panel's conclusion.

In response to the foregoing findings and conclusions from the Hearing Panel's Recommendation relating to the Hearing Panel's evaluation of the conduct that led to the petitioner's disbarment, the petitioner offers very little in rebuttal. He denies most of the illegal conduct, as noted—although he says he has "accepted" the fact of his convictions. He also argues that even assuming *arguendo* that he committed the crimes to which he pled guilty, those crimes had nothing to do with his practice of law or his conduct as an officer of the court, and that they for that reason have little or no continuing adverse weight as to his present petition for reinstatement.

We adhere to our judgment to the contrary in *Committee on Legal Ethics of the West Virginia State Bar v. Moore*, 186 W.Va. 127, 131, 411 S.E.2d 452, 456 (1991). We reject the suggestion that the misconduct for which the petitioner was disbarred is any less relevant to his reinstatement than it was to his disbarment. His misconduct is as relevant to his fitness for the practice of law as it would be if he had been convicted of filing false legal fee petitions, instead of false campaign finance reports; of extorting money from clients, instead of from people doing business with the government; of falsely reporting income on his law practice returns, instead of his personal returns; and of obstructing federal investigators who were looking into his legal practice, instead of into his conduct of governmental affairs.

In sum, the petitioner engaged in extremely serious misconduct, misconduct showing a willingness—on a sustained and knowing basis—to be dishonest, to deceive, to conceal the truth, and to bend, manipulate, and violate the law—for personal and professional gain. As this Court recognized in its opinion disbarring the Petitioner, his serious misconduct went to the heart of the trust and integrity that is essential to the profession of law. It would take an extraordinary set of countervailing factors to overcome the weight of this misconduct in order to permit reinstatement of a law license.

As to the *second factor* identified in *Brown II*, character, maturity, and experience at the time of disbarment, the Hearing Panel stated as follows:

The second factor identified by the *Brown II* Court is Moore's character, maturity, and experience at the time of his disbarment. Although there is not much discussion of this factor in the case law, it appears to allow the Panel to differentiate between the conduct of younger and less experienced attorneys and the conduct of attorneys of Moore's experience and sophistication. As the Court noted in *Brown II*, "a youthful and inexperienced attorney may have blundered as a result of inexperience rather than as a result of deliberate calculation." Moore, however, committed his offenses when he was an experienced

and mature attorney. Moreover, the evidence demonstrates that he did not "blunder" into an isolated act of misconduct. His acceptance of unreported cash from political supporters was not limited to the 1984 elections, but was apparently a course and pattern of conduct over much, if not all, of his political life. The evidence, including his own admissions, indicate that he received substantial amounts of cash from various individuals for both political and personal use over a period of many years. He actively involved others, such as Craig and Leaberry, in both his unlawful schemes and his attempts to cover up those schemes. As a result, this factor weighs heavily against Moore's reinstatement to the West Virginia Bar.

We agree with the Hearing Panel's evaluation of the second factor. We omit most of the Hearing Panel's discussion of the *third factor*, occupation and conduct since disbarment, because the Panel's discussion is not of great material weight. The Hearing Panel did say:

The third factor identified by the Court is Moore's occupation and conduct since his disbarment. Since his offense, Moore has not been accused of any criminal acts. He is apparently active within his community and continues to make significant cash contributions to charity and his church, all of which are commendable. He is currently acting as a consultant for various companies and individuals.

This Court has reviewed the submissions of the petitioner with respect to the Hearing Panel's discussion of this factor. He argues that the Hearing Panel's discussion does not give sufficient recognition or weight to his community service activities. We have carefully taken these activities into account, and we find that they are indeed notable; and as the Hearing Panel stated, they are commendable. We do not conclude, however, that their weight is such that they, taken alone or in combination with other factors, overcome the adverse weight of the misconduct for which the petitioner was disbarred. (The issue of what the petitioner has and has not done since his disbarment with respect to acknowledging his misconduct, and address-

ing the attitudes and circumstances that led to his misconduct, can be seen as falling within this factor. However, the Hearing Panel treated this issue separately, and we will follow that format.)

As to the *fourth factor*, the passage of time, the Hearing Panel's recommendation stated:

The Court has also identified the time elapsed since disbarment as a consideration. While the Panel recognizes that almost 12 years have passed since Moore's disbarment, the Panel concludes that mere passage of time alone is insufficient to warrant reinstatement. *Brown II*, 166 W.Va. at 234–235, 273 S.E.2d at 571–572.

We recognize that the passage of twelve years is a significant period of time. Many reasons can be seen for considering of the passage of time in evaluating a petition for reinstatement from disbarment. Time may bring greater maturity than at the time of the misconduct; time may give an opportunity for a person to recognize, address, and overcome the circumstances and conditions that led to the misconduct; time may reduce the perception of the misconduct's gravity, perhaps because of changing mores or by placing the conduct in a historical perspective. None of these considerations in the instant case, however, would weigh in the petitioner's favor. We do not feel that the passage of time since the conduct for which the petitioner was disbarred is a factor that, taken alone or with other mitigating factors, outweighs the gravity of his misconduct.

As to the *fifth factor*, present legal competence, the Hearing Panel stated:

5) Moore's Present Competence in Legal Skills

Arch A. Moore, Jr., is à gifted politician and competent attorney. The Panel does not question his legal competence. Moore was, in fact, instrumental in helping enact some of the most historical legislation in this country. He is a shrewd politician who made significant contributions in the various public offices which he held.

Nevertheless, the Panel questions Moore's understanding of the ethical standards that dictate a lawyer's conduct . . . .

We agree with the Hearing Panel's assessment on this point.

After making its five-factor analysis, the Hearing Panel's Recommendation continued as follows:

> There is a second reason to deny Moore's Petition for Reinstatement. The Supreme Court of Appeals has repeatedly held that, before granting reinstatement, it "must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration." Syl. Pt. 1, *Brown II*; Syl. Pt. 2, *Lawyer Disciplinary Board v. Sayre*, 207 W.Va. 654, 535 S.E.2d 719 (2000); Syl. Pt. 2, *Committee on Legal Ethics v. Pence*, 171 W.Va. 68, 297 S.E.2d 843 (1982). The Panel considers this most compelling, particularly in light of Moore's abuse of power and influence conferred by his position as Governor, his subsequent attempts to obstruct the Government investigation and his continuing failure to accept any responsibility for his misconduct. Given the severity of Moore's criminal conduct and his apparent denial of any responsibility for his actions, the Panel concludes that reinstating him to the practice of law will "have a justifiable and substantial adverse impact on the public confidence in the administration of justice."

In this regard, the Panel notes the adverse impact on the public confidence in the administration of justice must be "justifiable and substantial." There may be cases where there is a substantial adverse impact on the public confidence in the administration of justice, but the impact is the result of prejudice or of the public's lack of knowledge of the true facts. In such a case, reinstatement might be appropriate despite the potential impact of the decision. However, this is not such a case.

We concur with the Subcommittee's analysis on this point.

The Hearing Panel's Recommendation then separately addresses the issue of the petitioner's non-acknowledgment of guilt and non-acceptance of responsibility for wrongful acts, stating as follows:

> Relying on *In re Smith* [214 W.Va. 83, 585 S.E.2d 602 (1980)][3] and *In re Hiss* [368 Mass. 447, 333 N.E.2d 429 (1975)], Moore argues that the Panel cannot consider his failure to acknowledge his guilt or accept responsibility for his wrongful acts. The Panel understands Moore's contention and recognizes that, as a general principle, expressions of repentance may not be required in every case. For example, there may be cases where the attorney seeking reinstatement honestly and sincerely believes in his innocence and, in light of all of the evidence, his failure to acknowledge guilt should not be held against him. However, the Panel concludes that this is not such a case because, among other reasons, Moore's claim of innocence is overwhelmingly contradicted by the evidence.

> The notion of remorse is an important consideration in many areas of law. Courts routinely consider remorse in sentencing. Moreover, in other reinstatement cases, the Court has recognized that repentance can be a positive factor for reinstatement. *See, e.g., Lawyer Disciplinary Board v. Pence*, 194 W.Va. 608, 616, 461 S.E.2d 114, 122 (1995) ("We are also mindful of Mr. Pence's stated personal remorse, embarrassment and shame for the conduct that led to disciplinary action being taken against him") and *Lawyer Disciplinary Board v. Vieweg*, 194 W.Va. 554, 560, 461 S.E.2d 60, 66 (1995) ("the record demonstrates that Mr. Vieweg has been forthright in admitting his misconduct and has discussed his actions with some of those who have suffered from the misconduct"). Certainly, if repentance is a positive factor in some cases, the absence of repentance may be relevant to a decision in others. This approach is also consistent with decisions from a number of other jurisdictions.

> The Panel is charged with determining whether Moore possesses the requisite

---

**3.** This Court's previous opinion in *In re Smith* was published at 166 W.Va. 22, 270 S.E.2d 768 (1980). That opinion was subsequently withdrawn, although it was cited in *In re McMillian*, 210 W.Va. 265, 268, 557 S.E.2d 319, 322 (2001); that citation is of no effect.

character and integrity to practice law. In deciding that question, the Panel cannot ignore the fact that the criminal conduct that led to Moore's disbarment is inconsistent with the character and integrity expected of an attorney in West Virginia. The underlying facts establish that, whatever Moore's virtues, his history includes a pattern and practice of misconduct over a period of many years. As a result, it is reasonable for this Panel and the Supreme Court of Appeals to require him to produce evidence of rehabilitation, including evidence that he has recognized and addressed the character flaws that led him to violate professional ethical standards, the criminal law, and the public trust.

While Moore asks the Panel to conclude that he can now be trusted to abide by the law and the Rules of Professional Conduct in the future, he has failed to offer any evidence that he has personally addressed the reasons for his misconduct, expressed contrition for what he did, or even recognized that he did much wrong in the first place. Yet, without some acknowledgment from Moore that he has consciously dealt with the personal failings that led to his history of misconduct, there is no assurance that he will act in accordance with the Rules of Professional Conduct in the future. To the contrary, Moore's attitude toward backdating documents and his less than candid testimony under oath before this Panel, about both the reasons for his plea and his complicity in the underlying crimes, is inconsistent with his claim of rehabilitation. As a result, the Panel concludes that Moore has yet to recognize and accept responsibility for the gravity of his actions or to realistically address the character traits that led to his wrongful acts in the first place.

Thus, the Hearing Panel's Recommendation gives substantial weight to the fact that the petitioner has not expressed remorse or apology for any of the conduct that led to his disbarment. The petitioner's response is to say that he does not believe that he did anything wrong—so why should he—and how can he—be remorseful? The petitioner argues that the cases of *In re Hiss,* 368 Mass. 447, 333 N.E.2d 429 (1975), and *In re Smith,* 214 W.Va. 83, 585 S.E.2d 602 (1980) preclude giving substantial weight to the fact of the petitioner's stated belief and contention that he did not engage in any wrongful conduct, and to his lack of expressions of remorse or any other conduct designed to address the circumstances that led to his alleged misconduct.[4]

■ We have examined the *Hiss* and *Smith* opinions, and they do not go so far as the petitioner contends. They stand for the common-sense proposition that the fact that a person does not acknowledge their past misconduct, for whatever reason, will not *per se* bar the consideration or granting of a petition for reinstatement. This fact, rather, is simply another piece of evidence to consider, and to be given such weight as it deserves in light of the circumstances.

As we have noted, the first premise of our evaluation with respect to this case and this issue is not what the petitioner thinks or says that he did or did not do—or whether the petitioner thinks that what he did was wrong. In this regard, we are constrained by our previous decision, by the decisions of two federal judges, and by the very substantial evidence of record—that conclusively establish *the fact* of petitioner's repeatedly engaging in conduct that was *in fact* seriously wrong.

Given this premise, if then the petitioner truly does not subjectively believe that he engaged in conduct that was wrong (that is, if one sets aside the Hearing Panel's conclusion of the petitioner's continuing, knowing, and deliberate deception), then there are two other possibilities.

The first possibility is that the petitioner is, for whatever reason, in such a state of denial as to be unable to appreciate the difference between reality and imagination with respect to what he did and did not do.

---

4. The Hearing Panel was unwilling to credit the petitioner for acting in "good faith" in this regard:

> As discussed herein, the Panel concludes that Moore cannot possibly maintain an honest belief in his innocence given the facts of record in this case.

If this is the case, a necessary premise for rehabilitation (and for the ability to practice law)—the ability to appreciate the reality of what one is doing and has done—is missing from the petitioner.

The second possibility is that the petitioner's ability to form reasonably acceptable moral and legal conclusions about his conduct—and his ability to appreciate and apply the commonly-agreed upon meaning of the law and the ethical requirements of the legal profession—are so far from adequate that he similarly has no business practicing law.

Under either the analysis made by the Hearing Panel, then, or under either of these two other possibilities—or under some combination of the three—the fact of petitioner's failure to acknowledge the misconduct that led to his disbarment weighs substantially against reinstatement.[5]

The list of well-respected members of the West Virginia State Bar and others who have lent their names to the petition for reinstatement, expressing support for the petitioner, is impressive. The basis for such expressions may be readily recognized—the petitioner has made great contributions to the United States and the State of West Virginia. He developed a reputation as an efficient government administrator. He risked death and was grievously wounded in the service of his country. His heroic conduct entitles him to the grateful thanks of every citizen.

But the issue before this Court is not the petitioner's heroism, or his many accomplishments, or the support and friendship that these have gained him. The issue is his reinstatement after having been disbarred for serious, wrongful conduct.

In seeking such reinstatement, the petitioner has chosen a difficult path. He has denied that he committed the wrongdoing that was the basis for his disbarment, in the face of overwhelming evidence to the contrary. Recognizing the unlikelihood that this or any Court could accept the argument that he has not in fact committed serious misconduct, he asks this Court to give little weight

to both his misconduct *and* to his denial of that misconduct. He asks the Court to largely focus on the fact that he has not committed any misconduct *since* he was disbarred.

In fact, however, the petitioner's continued denial of wrongdoing has forced this Court to give substantial attention and weight to the proven, serious, criminal misconduct for which he was originally disbarred—conduct that he admitted to under oath, in statements that he now says—under oath—were lies.

The petitioner's misconduct showed a shocking disregard by the petitioner for the public trust and for the standards of the legal profession. The petitioner has had an ample opportunity to come to a realization that his conduct was wrong, and to take steps to demonstrate that realization. Despite the passage of time and the petitioner's record since his disbarment, the record strongly suggests that there has been little change in the underlying attitudes and perceptions that directly led to the misconduct for which he was disbarred.

### III.

■ This Court should and does give substantial deference to the factual findings of the Hearing Panel Subcommittee of the Lawyer Disciplinary Board, unless they are not supported by reliable, probative, and substantial evidence in the record. *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994). We have also independently weighed all of the evidence relating to the factors and considerations discussed herein above, and we concur with most of the Hearing Panel's evaluations and conclusions. We conclude that the Recommendation of the Hearing Panel should be adopted. Accordingly, we deny the Petition for Reinstatement.

Petition Denied.

Justice McGRAW, deeming himself disqualified, did not participate in this decision of this case.

---

5. In this regard, it could be argued that the petitioner has shown "the courage of his convictions" in refusing to express apology or remorse. But courage and conviction—while often admira-

ble qualities—are not positive factors in terms of reinstatement of a law license, if they are expressed in connection with adhering to the position that one did no wrong, when in fact one did.

Justice ALBRIGHT, deeming himself disqualified, did not participate in this decision of this case.

Judge ANDREW N. FRYE, Jr., sitting by temporary assignment.

Judge DAVID M. PANCAKE, sitting by temporary assignment.

Chief Justice STARCHER concurs and reserves the right to file a concurring opinion.

Justice DAVIS and Judge PANCAKE concur and reserve the right to file a concurring opinion.

Justice MAYNARD concurs and reserves the right to file a concurring opinion.

STARCHER, C.J., concurring.

## I.

I concur in the Court's judgment and opinion. I write separately to state my belief, echoing Justice Maynard's separate opinion, that the Court's action in this case is distinguishable from the result in *In re Smith*, 214 W.Va. 83, 585 S.E.2d 602 (1980) only by the fact that a slim majority of the *Smith* Court believed that serious malfeasance and corruption did not have the same weight as do the members of this Court who decided the instant case. In other words, I believe that the Court that decided the instant case would have reached a different result in the *Smith* case.

In my opinion, the Court that decided the instant case would have followed the recommendation of the State Bar committee in *Smith* that recommended non-reinstatement, and would have taken the position of the *Smith* minority opinion, authored by former Justice Miller. Thus I agree with Justice Maynard that while the Court's *per curiam* opinion in the instant case does not explicitly overrule *In re Smith*, it does so *sub silentio*.

## II.

I also wish to state my perspective on the issue raised in Justice Davis' separate opinion regarding the reinstatement of former Judge John Hey's law license. I realize that reasonable minds may differ on these issues, and I respect the sincerity and force of the view that Justice Davis takes.

However, to my view, while there may be some similarities, there are also many clear differences between the *Moore* and *Hey* cases.

Both men abused positions of public trust, both engaged in reprehensible conduct (but conduct of a totally different nature); in both cases, public confidence in government suffered injury.

The differences, as I see them, are as follows: Judge Hey's misconduct was directly tied to and came from a sickness, his alcoholism. Governor Moore's was not. Judge Hey admitted to committing two battery *misdemeanors* against private individuals, crimes that did not involve theft or dishonesty; Governor Moore committed *felonies* that involved dishonesty, pleading guilty to mail fraud, filing false tax returns, extortion, and obstruction of justice. Judge Hey has spent many years in counseling and treatment for the problems that led to his misconduct, and continues to do so to this day; Governor Moore has done nothing of the sort. Judge Hey pled guilty and made several statements of apology regarding those whom he offended and he performed in excess of 600 hours of volunteer service at a women's shelter. Judge Hey was also assessed $20,000.00 as a penalty for his misconduct—a penalty that this writer believes is the only instance of this ever occurring. Governor Moore has refused to acknowledge any wrongdoing, and has disavowed his guilty pleas.

In sum, there are substantial differences in the two cases.

## III.

Perhaps most importantly, the Hearing Panel that heard Judge Hey's petition for reinstatement (a panel that included a female attorney), issued a lengthy and reasoned opinion recommending reinstatement, subject to serious conditions including continuing treatment. The panel that heard Governor Moore's petition recommended that he not have his privilege to practice law restored.

In *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994), this Court stated that we should give substantial deference to the recommendations of Hearing Panels. We should have shown that deference in the *Bernard Smith* case; we did in the *John Hey* and *Arch A. Moore, Jr.* cases.

## IV.

For the foregoing reasons, I concur in the Court's opinion.

DAVIS, J., concurring.

In this disciplinary proceeding, the Court has denied Mr. Moore's petition for reinstatement of his law license. I fully concur in this decision and all aspects of the meticulously documented opinion. I have chosen to write separately to underscore a few matters that I find to be important.

### A. Admission of Past Wrongdoing is Essential for Reinstatement

In the recent case of *Lawyer Disciplinary Board v. Hey* (No. 28239, October 10, 2003),[1] I dissented from the majority's decision to reinstate the law license of John Hey. The proceeding against Mr. Moore is no different than that of the proceeding against Mr. Hey. Both Mr. Hey and Mr. Moore pled guilty to criminal charges and both petitioners refused, in reinstatement proceedings, to acknowledge their role in committing the crimes to which they pled guilty. I believe it is this Court's duty to the public and the bar to deny reinstatement of a law license when there is no admission to and acceptance of responsibility for the conduct which caused disbarment. *See* Syl. pt. 4, in part, *In the Matter of Dortch,* 199 W.Va. 571, 486 S.E.2d 311 (1997) ("When assessing the moral character of an applicant whose background includes a criminal conviction, the following factor[ ] should be considered: . . . The applicant's current attitude about the prior offenses (e.g., acceptance of responsibility for

and renunciation of past wrongdoing, and remorse[.]")).

The record in Mr. Hey's case revealed laudable post-disbarment conduct by him. Similarly, the record in Mr. Moore's case evidenced commendable post-disbarment conduct. However, a critical factor in my dissent in Mr. Hey's case was that "the record d[id] not demonstrate that [Mr. Hey] has accepted responsibility for his actions. By his own admission, he pled guilty to criminal charges only to preserve his pension."

In the instant proceeding, the majority opinion found that Mr. Moore previously "engaged in extremely serious misconduct, misconduct showing a willingness—on a sustained and knowing basis—to be dishonest, to deceive, to conceal the truth, and to bend, manipulate, and violate the law—for personal and professional gain." In denying Mr. Moore's petition for reinstatement of his law license, the majority opinion concluded that Mr. Moore's "continued denial of wrongdoing has forced this Court to give substantial attention and weight to the proven, serious, criminal misconduct for which he was originally disbarred—conduct that he admitted under oath, in statements that he now says—under oath—were lies."

If this Court reinstated Mr. Moore's license we would, in effect, be exonerating him from all guilt for the crimes to which he pled guilty. This result is the real motivation behind Mr. Moore's protestations of innocence. He seeks to use reinstatement of his law license as material support for his preposterous claim of innocence of the crimes to which he pled guilty. Fortunately, this Court has declined the invitation to be an "image maker" and correctly denied Mr. Moore's petition for reinstatement—I only wish the Court had also had the wisdom to resist this temptation in its resolution of Mr. Hey's case.[2]

---

1. This case was disposed of by a memorandum order.

2. By denying Mr. Moore's petition for reinstatement in the case *sub judice,* while nevertheless granting reinstatement to Mr. Hey, this Court

has sent the message that crimes perpetrated for financial gain are more egregious than crimes against women. I find this blatant disregard for the treatment of women in this State to be barbaric and reprehensible.

## B. Ethics Expert Ignored Ethics Precedent

The final point I have to make involves "[t]he list of well-respected members of the West Virginia Bar ... who have lent their names to the petition for reinstatement[.]" I find it rather disheartening to know that among the supporters for Mr. Moore's reinstatement was a member of the Bar who proclaims to be an expert in ethics. Although I understand our legal system is comprised so that a party can obtain a "hired gun" to say anything in litigation, lawyer disciplinary proceedings have no place for this type of advocacy.

In a letter to this Court supporting Mr. Moore's reinstatement, the expert stated that "Governor Moore has accepted responsibility for the actions which resulted in the loss of his law license...." Additionally, the expert explained

> [m]y experience as a teacher of legal ethics, a frequent lecturer on the subject for CLE organizations throughout the country, and as an expert witness in legal ethics cases in West Virginia and a dozen other states leads me to the firm conclusion that, in this case, reinstatement to the practice of law is not only appropriate but highly desirable.

The majority opinion in this case has aptly demonstrated that Mr. Moore has not accepted responsibility for his unlawful actions that led to his disbarment. Thus, in order to support Moore's reinstatement, this ethics "expert" had to ignore not only the true and well documented facts of this case, but also the established law of this jurisdiction. *See, e.g.,* Syl. pts. 1, 2 & 3, *In re Brown,* 166 W.Va. 226, 273 S.E.2d 567 (1980) (establishing standards for reinstatement). *See also* Syl. pt. 3, *Committee on Legal Ethics v.*

*Roark,* 181 W.Va. 260, 382 S.E.2d 313 (1989) ("Ethical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the office.").[3] To borrow from the comments of a former West Virginia Law School Professor of Ethics, I am certain Mr. Moore's expert would not relish trying "to explain [his position in] this case to a roomful of law students." Jack Bowman, *Contingent Fee Case Defied Explanation,* The State Journal, October 24, 2003, at 39.

The integrity of our legal system simply cannot tolerate "hired gun" advocacy in lawyer disciplinary proceedings. The position taken by Mr. Moore, in his quest for reinstatement, tramples upon fundamental principles of ethics. In spite of the clear ethical flaw in Mr. Moore's position, he successfully found a purported ethics expert to support his position. This is troubling to me. This Court has an uncompromising duty to make certain that honest and morally upright persons are representing the legal affairs of the public. To that end, "hired gun" proponents have no place in lawyer disciplinary proceedings.

In view of the foregoing, I concur. I am authorized to state that Judge Pancake joins me in this concurring opinion.

MAYNARD, Justice, concurring.

I reluctantly concur with the majority decision to deny the reinstatement of Governor Moore's license to practice law and with the majority's rationale for its decision. I write separately simply to express the fact that I am troubled by what may be claimed or perceived by some as unequal treatment of Governor Moore based solely on political considerations.

---

3. To adopt the view championed by this proponent of Mr. Moore, this Court would be required to disregard the doctrine of *stare decisis. See Mayhew v. Mayhew,* 205 W.Va. 490, 499, 519 S.E.2d 188, 197 (1999) (" 'Stare decisis is the policy of the court to stand by precedent.' *Banker v. Banker,* 196 W.Va. 535, 546 n. 13, 474 S.E.2d 465, 476 n. 13 (1996)). There are simply no grounds in this case to warrant such disregard. *See Woodrum v. Johnson,* 210 W.Va. 762, 766 n. 8, 559 S.E.2d 908, 912 n. 8 (2001) ('*Stare decisis* is not a rule of law but is a matter of

judicial policy ... It is a policy which promotes certainty, stability and uniformity in the law. It should be deviated from only when urgent reason requires deviation.... In the rare case when it clearly is apparent that an error has been made or that the application of an outmoded rule, due to changing conditions, results in injustice, deviation from that policy is warranted.' " (quoting *Dailey v. Bechtel Corp.,* 157 W.Va. 1023, 1029, 207 S.E.2d 169, 173 (1974) (additional citations omitted))).

Any fair analysis requires that we compare the case of Governor Moore to the case of W. Bernard Smith. After his election in 1960, Governor W.W. Barron appointed Smith, a licensed attorney, to the position of State Welfare Commissioner, a cabinet level position. Smith was thereafter elected to the State senate from Logan County. Like many former Barron department heads, Smith was later indicted for bribery. In a 1970 trial, witnesses told of delivering bags of cash to Smith and others at the Capitol. Smith was tried twice and both trials ended in a hung jury. In 1971, Smith was acquitted of a federal perjury charge. Later that year, he and four other Logan politicians, called "the Logan County Five," were found guilty of violating Section 241 of Title 18 of the United States Code which made it unlawful to conspire to injure any citizen in the free exercise or enjoyment of any right or privilege secured by the Constitution or the laws of the United States.

> The indictment charged that ... Smith and his codefendants caused "fraudulent and fictitious votes to be cast * * * all with the purpose and intent that said illegal, fraudulent, and fictitious ballots would be counted, returned and certified as a part of the total vote cast * * *." In other words, he was charged with "stuffing" the ballot box with fraudulent and fictitious ballots.

*In re Smith*, 158 W.Va. 13, 16, 206 S.E.2d 920, 922 (1974).

As a result of his conviction, Smith served a term in federal prison, he was expelled from the Senate, and his law license was annulled. In 1979, Smith petitioned for reinstatement of his law license. A subcommittee of the Committee on Legal Ethics of the West Virginia State Bar recommended that the petition be denied. Despite this recommendation, in *In re Smith*, 214 W.Va. 83, 585 S.E.2d 602 (1980), this Court, in a 3 to 2 decision, granted Smith's petition for reinstatement and gave him back his law license. Justices Miller and McGraw dissented.[1]

A fair but casual observer who compares the facts of the Smith and Moore cases would be hard pressed to find any genuinely significant differences in the two cases that would justify granting Smith's petition for reinstatement of his law license while denying Governor Moore's petition. Governor Moore and Smith both held offices of high public trust—Moore a congressman and governor and Smith serving as W.Va. Commissioner of Welfare and a State senator. Both were convicted of federal felonies, serious crimes involving violations of the public trust, and both were incarcerated in federal prisons. Both had a myriad of other charges which did not result in convictions. Both continued to assert post-conviction that they were innocent or had been the victim of some miscarriage of justice which resulted in a wrongful conviction. And each man, upon his release from federal prison, resumed vigorous political activity in support of chosen candidates and issues.

Frankly, a fair-minded person may conclude that the only real difference in the Bernard Smith case and the Arch Moore case is that Arch Moore is a Republican and Bernard Smith was a Democrat who could deliver thousands of Democratic votes on election day. And, oh yes, Smith got his law license back and Arch Moore did not.

A few years ago, this Court considered and rejected adopting a rule that would deny to every convicted felon a law license. The Court chose rather to continue to consider felon applicants on a case-by-case basis. I voted for the proposed rule to bar all felons from receiving a law license precisely because of situations like the instant one. In fairness, and all other things being equal, if the rule is to be applied on a case-by-case basis, then Bernard Smith must be the yardstick by which this Court judges all other lawyers. In other words, Bernard Smith is the standard of comparison.

Based on the Bernard Smith standard, and utilizing the case-by-case approach chosen by the Court, the conduct of an applicant seeking a law license must be weighed against the

---

1. The facts concerning Bernard Smith were drawn from *"Logan Five" Defendant Dead At 64*, The Charleston Gazette, April 17, 1995, at 1A; *In re Smith*, 158 W.Va. 13, 206 S.E.2d 920 (1974); and *In re Smith*, 214 W.Va. 83, 585 S.E.2d 602 (1980).

conduct of Bernard Smith, a man to whom this Court gave a law license. Logically, how could one deny a law license to, or disbar a person, whose conduct is less egregious than, or equally egregious to, the conduct for which Smith's license was originally annulled? For this very reason, I have voted to give law licenses to applicants whose conduct, while very unsavory and improper, did not rise to the level of Smith's wrongdoing. In short, if Smith was allowed to practice, so, in fairness, must they.

Notwithstanding the foregoing, today I vote with the majority on this unanimous vote with the understanding that with this decision, we finally have an opportunity to depart from the Smith standard. Now, when comparing new cases to decided cases, we fairly can point to this case as a reply to those who would cry foul. Now the standard can be based on fundamental notions of what is right, what is best for the public, what is best for the legal profession, and what is fair. In the end, I believe that the key to responding to any charges of unequal treatment of Governor Moore lies in the answer to one simple question: Would this Court, as it is constituted today, restore Bernard Smith to the practice of law? I know the high standards of the judges with whom I sit, and I am very confident that the answer to this question would be a resounding NO!

It is my belief that the Smith case has long infected our jurisprudence in this area, and the cure is harsh and unpleasant. But the simple fact is that years ago, W. Bernard Smith absolutely should have been denied reinstatement, and so must Governor Moore today. Judges make decisions every day that they strongly dislike or find extremely distasteful. This decision is certainly at the top of the list for me. It is really difficult for me to reconcile the glaring differences in this Court's treatment of the Moore and Smith cases. I tell myself if there is truly any injustice in these two cases, the injustice was in the outrageous partisan favoritism shown to Bernard Smith years ago when his license was wrongfully restored. On the other hand, I also am absolutely morally certain that there is no partisanship in this decision by the Court today.

Certainly enough has been said at this point, but I cannot lay this pen aside without expressing the sadness and regret many West Virginians feel about this tragedy. And it is a tragedy. Governor Moore is a war hero who was horribly wounded in combat fighting for this country in World War II. If you erase, just for a minute, his now very public failings, and look at his tremendous accomplishments as a congressman and governor, they are truly remarkable. But this case is not about those things. Rather, it is about what is best for the Bar, the judicial system, and the people of West Virginia. Accordingly, for the reasons set forth herein, I respectfully concur with the unanimous decision of this Court.